**FLORENCIO ROMÁN, INC., Plaintiff,**

v.

**PUERTO RICO MARITIME SHIPPING AUTHORITY, Defendant.**

No. 77–368.

United States District Court,
D. Puerto Rico.

March 21, 1978.

On Motion to Alter Judgment
June 13, 1978.

Daniel R. Dominguez, Laffitte & Dominguez, Hato Rey, P. R., for plaintiff.

Jose Antonio Fuste, Jimenez & Fuste, Hato Rey, P. R., for defendant.

## MEMORANDUM OPINION AND ORDER

GRANT, Senior District Judge, sitting by designation.

This case was tried before the Court without a jury on March 15, 1978 in San Juan, Puerto Rico. The action is one for money damages filed by Florencio Román, Inc., a fruit and vegetable distributor and importer, against the Puerto Rico Maritime Shipping Authority, a public corporation of the Commonwealth of Puerto Rico, which acts as a maritime carrier pursuant to the relevant statutes. The action is one for relief pursuant to the Carriage of Goods by Sea Act, 46 U.S.C. § 1300, *et seq.* The parties stipulated in open Court that the above-referred statute would be of application since it was incorporated into domestic traffic pursuant to 46 U.S.C. § 1312. This Court has jurisdiction pursuant to 28 U.S.C. § 1333 since this is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The following shall constitute the Court's findings of fact and corresponding conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

The plaintiff, Florencio Román, Inc., as already stated, is a merchant and broker of vegetables with offices in San Juan, Puerto Rico. On April 9, 1976 plaintiff had shipped on its behalf a load of plantains aboard defendant's vessel SS PONCE DE LEON, Voyage 38–S, from Miami, Florida to San Juan, Puerto Rico, on defendant's Refrigerated Container No. PRMZ–591703. The bill of lading covering the shipment was marked as Joint Exhibit No. 5 by the parties. The bill of lading for this particular shipment is No. 73411047640. In said bill of lading there appear all exceptions and/or requests for temperatures. These are clearly stamped on the face of the bill of lading. The bill of lading specifically states that the shipment was a "shipper's load and count, consignee to unload"; the requested temperature to be maintained by the carrier was 48° F, and the refrigeration unit was set at 48° F while the unit read 50° F on the outside thermostat. The commodity when it arrived at the Miami terminal of the defendant was pulping a temperature of 60° F as inserted in the bill of lading.

In this case, as in the other three claims which we will refer to throughout this Memorandum Opinion and Order, certificates of inspection by the United States

Department of Agriculture were issued at Miami, Florida when the produce arrived there from either Colombia or Ecuador, South America. The Court also received evidence to the effect that certificates of agricultural inspection were issued at the port of destination by the United States Department of Agriculture stating the condition of the produce upon arrival at the premises of plaintiff Florencio Román, Inc.

Immediately after arrival and after due inspection was carried out by the United States Department of Agriculture, a determination was made that 427 boxes out of the 752 boxes of plantains which were contained inside the trailer PRMZ–591703 had to be dumped since they were unfit for human consumption. The Court received evidence to the effect that the Reefer Temperature and Operating Report of the vessel showed that the produce was supposed to be transported when loaded at 48° F, to maintain 48° F. Daily readings up to the time of arrival at San Juan, Puerto Rico showed that the readings taken were 48°, 48°, 48°, 48° and 48°, respectively. The readings were taken twice a day on board the ship. For the purposes of the record, the agricultural certificate at the port of origin in relation to this particular shipment appears marked as Joint Exhibit No. 27; the agricultural certificate at the port of destination, that is, San Juan, Puerto Rico, appears marked as Joint Exhibit No. 6, and the dumping certificate appears marked as Joint Exhibit No. 7.

On April 9, 1976 plaintiff had shipped for its behalf a second load of plantains on board defendant's vessel SS PONCE DE LEON, Voyage 38–S, from Miami, Florida to San Juan, Puerto Rico in a Refrigerated Container No. PRMZ–593154. As it happens in the first case already discussed, the produce originated in Colombia and/or Ecuador, South America and was forwarded to Puerto Rico out of the Miami terminal of the defendant steamship corporation.[1] The bill of lading covering this shipment is iden-

tified by No. 3411047614. The same was accepted by the Court as Joint Exhibit No. 8.

Upon arrival of the produce at San Juan, Puerto Rico there was a joint inspection of the vegetables in question. Out of the 803 boxes of plantains inside defendant's refrigerated trailer 475 boxes had to be dumped since they were unfit for human consumption. Agricultural certificates of inspection were issued by the United States Department of Agriculture at the port of Miami, Florida and at the port of San Juan, Puerto Rico. These appear marked as Joint Exhibits No. 10 and No. 9, respectively. The dumping certificate for this particular case appears marked as Joint Exhibit No. 11. The Court received evidence that the vessel's Reefer Temperature and Operating Report for trailer PRMZ–593154 reads that when the produce was loaded the reading was 52° F, to maintain 48°. The readings taken on board the vessel while en route from Miami, Florida to San Juan, Puerto Rico read 48°, 49°, 50°, 50° and 50°. Readings were taken twice a day on board the ship.

On April 9, 1976 plaintiff had shipped a third load of plantains on board defendant's vessel SS PONCE DE LEON, Voyage 38–S, from Miami, Florida to San Juan, Puerto Rico. As stated before, this was also a transshipment of produce from an unknown forwarding carrier. The produce, as in all cases, originated either in Colombia or Ecuador, South America. When the produce arrived in Florida it was placed in defendant carrier's Refrigerated Container No. PRMZ–34848. The bill of lading for said movement is identified with No. 3411047636 and the same appears marked and accepted by the Court as Joint Exhibit No. 12.

As in the other two cases already described, certificates of inspection issued by the United States Department of Agriculture were issued at the port of transshipment, Miami, Florida, and at the port of San Juan, Puerto Rico, which was the port of

---

1. There is no evidence that the shipment from Ecuador and/or Colombia to Miami, Florida was done by the defendant carrier.

destination. These appear marked as Joint Exhibits No. 14 and No. 13, respectively.

Upon arrival of the produce and after due inspection, it was determined in relation to this shipment that there was a need to dump 698 cartons of plantains out of 750 cartons. The dumping certificate was issued and appears marked as Joint Exhibit No. 15.

The Reefer Temperature and Operating Report of the vessel in question states that the temperature of the produce when loaded was to be '48° F to maintain 48°. Readings taken on board the ship were 48°, 48°, 48° and 48°. The readings were taken twice a day before the ship arrived in San Juan, Puerto Rico.[2, 3]

The Court received testimony from Mr. Florencio Román, President of plaintiff corporation and from Mr. Juan J. Jeannot, Manager, Loss Prevention and Claims, Puerto Rico Marine Management, Inc., which is, as stipulated to the Court, a private corporation that manages the Puerto Rico Maritime Shipping Authority, which acts as the carrier in its capacity as a public corporation created by the laws of the Commonwealth of Puerto Rico. Mr. Román testified, in essence, that the produce in question was received at the port of Miami, Florida in good order and condition and that it outturned unfit at the port of destination. The evidence, seen as a whole, does not show on what specific theory the plaintiff relied to prove its case which according to the Complaint is based upon the carrier's failure to comply with the terms and conditions of the contract of carriage under the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq., and also based upon fault and/or negligence of the carrier. The Court recalls that Mr. Román testified that he presumed that something went wrong inside the trailers in question because otherwise his produce would have never outturned spoiled. Mr. Román is a merchant who has been dealing in this type of com-

modity for at least thirty years and even with the aid of his experience, he could not state anything, but his impression of what happened without really knowing.

Defendant's witness, Mr. Jeannot, testified that the shipment which moved under bill of lading No. 341104764, see Joint Exhibits No. 5, No. 27, No. 6 and No. 7, was found to be suffering from a disease known as black rot. In his explanation of this disease, as an expert witness accepted as such by the parties, Mr. Jeannot made reference to a publication of the United States Department of Agriculture entitled "Bananas—Market Inspection Instructions", January, 1973, whereby it is stated that black rot is caused by a fungus known as thielaviopsis which produces black rot on pineapples also. Mr. Jeannot testified on his own knowledge and referring to the publication without objection on the part of the plaintiff, that this infection of the fungus takes place at the plantation, that it is a field disease and that green bananas usually do not show the black rot until they begin to turn yellow in transit or are in advanced stages of ripening. This, in Mr. Jeannot's opinion, accepted by the Court, explains why the certificates of inspection at the port of transshipment, Miami, Florida, seem to disagree with the United States Department of Agriculture reports at the port of destination issued in San Juan, Puerto Rico. Mr. Jeannot further testified at questions propounded by counsel for both parties that the same publication referred to above states in Item 55 that when certain diseases of the nature described are found by an agricultural inspector in connection with early stages of ripeness, then, the inspector should merely describe the condition and appearance of the commodity without specifically mentioning the nature of the spots. This explanation uncontradicted by the evidence is accepted by the Court as to why in all three shipments the certificates of inspection issued by the Unit-

---

**2.** There was an additional claim which was covered by Joint Exhibits 1, 2, 3 and 4 which, after the plaintiff had rested, the same was withdrawn with prejudice.

**3.** It is curious to note that two of the trailer loads in question carried oranges in addition to plantains. The oranges arrived in good order and condition.

ed States Department of Agriculture at the port of transshipment, Miami, Florida, failed to mention black rot by its name.

Mr. Jeannot further testified that as to the shipments covered by Joint Exhibit No. 8, bill of lading No. 3411047614 and Joint Exhibit No. 12, bill of lading No. 3411047636, the certificates of inspection issued by the United States Department of Agriculture at the port of destination, San Juan, Puerto Rico, show that the field disease black rot was affecting these plantains and that said field disease is only traceable and imputable to the inherent nature of the commodity and of its growing and planting process.[4]

Mr. Florencio Román testified in the Spanish language through the use of an official translator of the Court. The Court is satisfied with the translation made insofar as the translation was fully understood as expounded in English by the translator. The parties did not raise any objection to the correctness of the translation as such. *Santana v. United States of America*, 572 F.2d 331 (1st Cir. 1977).

There is no evidence in the record to the effect that the defendant carrier violated the terms and conditions of the contract of carriage and/or that, in any event, it incurred in fault or negligence as pleaded by plaintiff in the Complaint.

The Court is aware of the rule of admiralty law which the federal courts have consistently applied in cases involving lost goods by an ocean carrier. The rule is to the effect that the cargo interest makes out a *prima facie* case by merely showing delivery of the goods to the steamship carrier and failure to return or outturn the goods in the same good order and condition. *Leather's Best v. The S. S. Mormaclynx*, 451 F.2d 800, 812 (2nd Cir. 1971) and *Miles*

*Metal Corporation v. The M.S. Havjo*, 494 F.2d 563 (2nd Cir. 1974). The reason for this allocation of the burden of proof is that when the breach of duty is the issue, the law takes into account the relative opportunity of the parties to know the fact in issue and to account for the loss which it is alleged is due to the breach. The shipowner and/or ocean carrier is in general terms in a better position than the cargo interest to know the cause of the loss and to show that it was one not involving the carrier's liability. It is for this reason that this Court expressed to counsel for the defendant after plaintiff rested that it would not entertain a motion to dismiss under Rule 50 until all the evidence had been heard. *Commercial Molasses Corporation v. New York Tank Barge Corporation*, 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

Here, defendant, the Puerto Rico Maritime Shipping Authority, was required by law to be in a better position to establish whether the plantains in question, which were loaded upon its refrigerated trailers and vessel, were damaged due to its imprudence and/or fault, in light of the presumption which favored the plaintiff. The defendant took on the burden of establishing before the Court not only that the plantains have a very short shell life, i. e., twelve to twenty days if kept properly from the plantation to the distribution outlets, but also showed that the plantains were affected by a field disease known as black rot which in no manner could the defendant steamship carrier impede it from damaging the plantains. In addition, the steamship carrier proved to the satisfaction of the Court that it kept the temperatures of the refrigerated containers within the plus or minus 5° rule which is contained in the Puerto Rico Maritime Shipping Authority's tariff No. 1,

---

4. Mr. Jeannot testified that there was an illegal Panama Canal harbor pilots' strike which affected the movement of ships through the Canal from South America to the South Coast of the United States from March 15, 1976 to March 31, 1976. He further testified that the Canal authorities declared that the situation was back to normal on or about April 3, 1976, but that normality was actually felt two days

after that. Although the testimony was obviously directed to establish that the plantains were delayed at the Canal Zone prior to transshipment to Miami, Florida, for their final destination at San Juan, Puerto Rico, the Court at this time finds it unnecessary to rely upon said evidence to attain the result, which is the dismissal of the Complaint.

FMC # 1, Rule 400, which involves the handling of cargo requiring ventilation, refrigeration or controlled temperature. See Defendant's Exhibit No. 2.

■ The Court further finds as a matter of law that the main cause for the damages sustained by the cargo of plantains was an uncontrollable cause, to wit, inherent defect, quality or vice of the goods for which neither the carrier nor the ship shall be responsible under the Carriage of Goods by Sea Act. See 46 U.S.C. § 1304(2)(m).

In view of the foregoing, it is hereby ordered, adjudged and decreed that judgment shall be entered against the plaintiff and on behalf of the defendant dismissing the Complaint filed herein with costs to the prevailing party as required by law. The Court will not make an award for attorney's fees insofar as we are not dealing with a case of contumacy or temerity under the rules of practice in the District of Puerto Rico. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

### ON MOTION TO ALTER JUDGMENT

■ This cause came before the court for a bench trial on March 15, 1978. On March 21, 1978, the court entered its Memorandum Opinion and Order by which judgment was entered against the plaintiff and on behalf of the defendant dismissing the complaint. On March 31, 1978, the plaintiff filed a Motion to Alter Judgment Pursuant to Rule 59(e). It is well established that Motions made pursuant to Rule 59 are addressed to the sound discretion of the trial court. *Globe Liquor Co. v. San Roman*, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948); *Dumas v. MacLean*, 404 F.2d 1062 (1st Cir. 1968). *See* 11 C. Wright and A. Miller, Federal Practice and Procedure, § 2803 (1973).

■ Plaintiff's main contention is that the court erred in dismissing the complaint because a *prima facie* case had been established and the law in Maritime Cargo Claims creates a presumption of negligence upon the showing of a *prima facie* case. It

is argued that plaintiff established a *prima facie* case once it was shown that the plantains were delivered to the carrier in good order and that plaintiff had subsequently received the goods in a damaged condition. While it is claimed that the court required plaintiff to prove negligence, a review of the Order entered on March 21, 1978, does not support this conclusion. The court specifically reviewed the law on this point and noted that the burden of proof is placed upon the carrier where a breach of duty is in question because it is in general terms in a better position to know the cause of the loss. (Memorandum Opinion and Order, p. 8). However, this does not mean that the burden of persuasion shifts to the defendant. It is only the burden of production that shifts, once the plaintiff has made the requisite *prima facie* showing. *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 812 (2nd Cir. 1971). The defendant has several ways in which to vindicate himself. As was stated in *Richmond Sand & Gravel Corp. v. Tidewater Const. Corp.*, 170 F.2d 392 (4th Cir. 1948):

> [H]e may show either how the disaster in fact occurred and that this was in no way attributable to his negligence, or that he exercised the requisite care in all that he did with respect to the bailed article so that, regardless of how the accident in fact transpired, it could not have been caused by any negligence on his part.

170 F.2d at 393–4.

In the present case, the court found that the defendant had accepted the burden of production and proved to the court that the plantains in question were refrigerated properly at all times and that the actual cause for the damage to the plantains was due to the fact that they were affected by a field disease known as black rot. (Memorandum Opinion and Order, p. 525.) As a result, the court found as a matter of law that the damage to the cargo was due to an uncontrollable cause, to wit, an inherent defect, quality or vice of the goods for which the defendant could not be held liable under 46 U.S.C. § 1304. (Memorandum Opinion and Order, p. 526.)

The plaintiff was never required to prove negligence as he now claims. Rather, as the Memorandum Opinion and Order show, the defendant overcame its burden and convinced the court that the reason for the damage to the goods was in fact the field disease of black rot and not due to any fault of their own. This determination was made after hearing all the evidence produced by both parties and, accordingly, it will not be modified now.

Plaintiff also argues that the court's conclusion that the field disease of black rot caused the loss of the plantains was not supported by the evidence. The basis for this position is the fact that the various certificates of inspection do not list black rot as the reason for the need to destroy the plantains. Yet, Mr. Jeannot, the expert witness for defendant, explained to the court that it is standard procedure for an Inspector to merely describe the condition and appearance of the disease affecting the commodity without specifically mentioning the nature of the spots. (*See* Memorandum Opinion and Order, p. 524.) This explanation, uncontested by plaintiff, is satisfactory proof to the court as to why the certificates failed to mention black rot by name. The evidence taken as a whole was clearly sufficient to support the conclusion that the field disease of black rot caused the damage to the plantains in question.

The plaintiff contends that the true cause of damage to the goods was over-ripeness due to improper refrigeration by the defendant. However, after a thorough reconsideration of all the evidence and all the arguments made by plaintiff in his current Motion, the court remains unconvinced. Accordingly, plaintiff's Motion to Alter Judgment Pursuant to Rule 59(e) is denied. The Memorandum Opinion and Order of March 21, 1978, will stand as entered.