**PUERTO RICAN–AMERICAN INSURANCE CO., Packers Provisions Co. of Puerto Rico, Plaintiffs,**

**v.**

**SEA–LAND SERVICE, INC., Defendant.**

**Civ. No. 86–0479 (JP).**

United States District Court, D. Puerto Rico.

Dec. 9, 1986.

Francisco Bruno Rovira, San Juan, P.R., for plaintiffs.

Jimenez, Graffam & Lausell, San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The plaintiffs, Packers Provisions Co. of Puerto Rico (Packers), and its insurance company, Puerto Rican-American Insurance Co. (PRAICO), brought this action against the defendant, Sea-Land Services, Inc. (Sea-Land) to recover for damages suffered by a shipment of fresh meat while being transported by defendant from Puerto Cortés, Honduras, to San Juan, Puerto Rico. The action was submitted to the Court under its admiralty jurisdiction, 28 U.S.C. § 1333,[1] and a non-jury trial was held on September 17, 18, 19 and 22, 1986. After careful review of the content of the testimony of the witnesses at trial and the exhibits submitted by the parties, the Court, pursuant to Fed.R.Civ.P. Rule 52(a), makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT:

1. Empacadora Alus, S.A. (Alus) is a slaughterhouse and meat processing facility located in San Pedro Sula, Honduras, that prepared and shipped 700 boxes of fresh bovine boneless beef to Packers.

2. The meat in question was processed between July 23 and July 30, 1985, from cattle which had been slaughtered between July 22 and July 29, 1985.

3. The Trailer Interchange Receipt issued in Honduras establishes that container SEAU 262149 was delivered at Alus' facility on August 1, 1985, on which date it was inspected and loaded by Alus employees, sealed with seal number 156–3273169, and returned to Sea-Land for shipment to San Juan, Puerto Rico.

4. The shipment of meat consisted of individual meat cuts which were vacuum packed in cry-o-vac bags.[2] A varying number of cry-o-vac bags was then placed in larger plastic bags lining the cardboard boxes. The cardboard boxes were 20 inches long, 16 inches wide, and 6 inches deep. Each box contained between 55 and 60 pounds of meat. The specifications to which the boxes were manufactured called for a maximum vertical loading capacity of 275 pounds.

5. Prior to loading aboard container SEAU 262149, the shipment of meat in question had been properly processed and cared for by Alus, was in good condition,

---

1. Subject matter jurisdiction was never affirmatively pled by plaintiffs, but was evident on the face of the complaint. Counsels' attempt to waive subject matter jurisdiction in a proposed pretrial order surprises the Court, for it is hornbook law that subject matter jurisdiction can never be waived.

  Plaintiffs' attempt to use Official Form 2(d) of the Federal Rules of Civil Procedure, making reference to the assertion that this Court has subject matter jurisdiction as "hereinafter more fully appears" was insufficient. Defendant averred and this Court finds that the contract of carriage was governed by 46 U.S.C. section 1304 (1982), among other statutes regulating shipping and other maritime matters. Admiralty and maritime jurisdiction of the United States is extended to causes of damage caused by a vessel on navigable waters. 46 U.S.C. Section 740 (1982). Clearly, plaintiff is asserting a cause of damage based on damage caused on or by a maritime carrier. As such, subject matter jurisdiction arises under 28 U.S.C. section 1333 (1982).

2. After butchering the beef into appropriate cuts, the beef is placed into plastic bags. The bags are sealed and then briefly heat treated at 180–200° F. This heat treatment constricts the bag and vacuum seals the meat inside. Cry-o-vac is apparently a trade name.

and had a temperature of 31 degrees Fahrenheit.

6. Fresh beef which is properly processed, promptly vacuum-packed in cry-o-vac packaging, and kept at 31 degrees Fahrenheit will remain fit for human consumption for a period of six to eight weeks after the slaughtering of the cattle.

7. The 700 boxes were stowed inside container SEAU 262149 in an "airflow pattern." This allowed cold air to circulate around the individual boxes. The boxes were placed with the 20–inch dimension running along the length of the container and the 16–inch dimension running across the width of the container. Each tier of cargo consisted of layers of four boxes each, placed across the container with a six to eight inch space between the boxes. Each layer was staggered alternately to the left and right in order to create the airflow pattern. No bracing was provided in order to prevent cargo shifting.

8. Container 262149 had an interior length of 385.5 inches. Given the box length of 20 inches and the container's interior length there were a maximum of 19 tiers. Loading 700 boxes in 19 tiers requires a minimum of 36 boxes in each tier. With 4 boxes to a layer, each tier must have had 9 layers. This accounts for 684 of the 700 boxes shipped. Simple arithmetic dictates that the last sixteen boxes must have gone on top of the nine layers.

9. Sea-Land received the shipment in question already loaded on container SEAU 262149 and issued bill of lading No. 156–310427 dated August 2, 1985. The bill of lading in its pertinent parts describes the shipment as follows: "Lot No. 94"; "700 boxes.—bovine fresh boneless beef"; "temperature supplied by shippers: 31 degrees Fahrenheit"; "cargo received reading 31 degrees Fahrenheit"; "shippers load stowage weight and count."

10. The third paragraph of Clause 7 of the bill of lading states as follows: "When a loaded container, van or trailer is received, carrier will set the thermostatic control to maintain air temperature in the container to within a range of plus or minus five degrees Fahrenheit of the temperature requested by the shipper on the face hereof."

11. There is no dispute as to the good condition of container SEAU 262149 at the time it was delivered to Alus for loading and subsequently returned to Sea-Land for shipment. At this time the refrigeration unit of the container was found to be working properly and maintaining the requested temperature of 31 degrees Fahrenheit. The walls, doors, floor, and roof of the container were also found to be in good condition and proper for the shipment in question.

12. Container SEAU 262149 was loaded at Puerto Cortes, Honduras, on August 2, 1985, aboard Sea-Land's vessel SS SHELLEY BAY. The SS SHELLEY BAY sailed from Puerto Cortes, Honduras on August 2, 1985, and arrived at the port of Kingston, Jamaica, on August 13, 1985, where the container remained at Sea-Land's agent's yard until August 15, 1985. On August 15, 1985, the container was loaded on Sea-Land's vessel M/V STRIDER JUNO. The M/V STRIDER JUNO arrived at San Juan, Puerto Rico, on August 17, 1985, where the container was unloaded.

13. On August 17, 1985, Sea-Land gave the delivery order for container SEAU 262149. On August 19, 1985, Packers had received notice that the container was available for delivery and had obtained all clearances required from the United States Customs Service for delivery of the shipment. However, the container remained in Sea-Land's yard until September 5, 1985, when it was picked up by Transporte Acosta, Inc., a trucker designated by Packers. At the time the container was picked up by Transporte Acosta, Inc., it was reading 31 degrees Fahrenheit.

14. During the 35 days the container was in Sea-Land's possession, readings of the container temperature were in compliance with the contractual obligation assumed by the carrier with the exception of three readings of 40, 40, and 46 degrees Fahrenheit.

15. While the container was in Sea-Land's possession at least two temperature readings were recorded each day. The readings of 40, 40, and 46 degrees Fahrenheit occurred on different days and were preceded and followed by proper readings. The recorded temperatures refer to the temperature of the air within the container and not the temperature of the meat itself. Temperature fluctuations occur routinely during defrosting cycles or during vessel loading or unloading operations when refrigeration units are shut off for safety reasons.

16. On September 6, 1985, when Packers opened the container it noted damage to the shipment. The bottom layers of cargo were crushed. Damage was especially severe at the bottom three layers. As a result of the crushing, some cry-o-vac bags had burst and the blood contained within the cry-o-vac bags had stained the boxes.

17. During unloading, Packers noted a conical hole, with diameter of five inches at the base of the cone. The hole was in the inside right wall of the container. The cover used to seal the hole on the inside of the container was found on the floor of the container. No evidence was presented regarding how or when the cover was dislodged, although it may have been dislodged during the loading or unloading of the cargo.

18. At some time after delivery, the gasket sealing the right side door of the container was found dislodged and damaged. No evidence was presented as to when the damage occurred. Again, the door may have been damaged during loading or unloading.

19. During the routine inspection of the imported beef performed by the United States Department of Agriculture (U.S.D.A.), the inspector refused entry to the United States to 650 boxes of fresh boneless beef cuts. Entry of this shipment was refused because in the 30 boxes actually inspected, there were three cuts of meat that had spoiled and unfit for human consumption. This meat was found in broken cry-o-vac packaging. The meat inspected from sound cry-o-vac bags was found to be in good condition, at acceptable temperatures, and would have been allowed into the United States. According to U.S.D.A. regulations, however, indication of spoilage in a randomly selected sample mandates refusal of entry to the entire shipment. 9 C.F.R. § 327.3 (1986).

20. Aside from the 650 boxes which were refused entry into the United States, there were 50 boxes of manufacturing beef in the same container that were allowed entry into the United States by the U.S. D.A.

21. After the shipment, an inspection of container SEAU 262149 found the refrigeration unit working properly.

22. Under U.S.D.A. regulations, Packers had the option of destroying the 650 boxes which had been refused entry into the United States, converting the same into animal feed, or re-exporting the product for final disposition outside of the United States. Packers opted to re-export the shipment, returning it to Alus.

## II. CONCLUSIONS OF LAW

The bill of lading issued in the instant case for carriage of goods by sea from Puerto Cortes, Honduras, to San Juan, Puerto Rico, is subject to the provisions of the Carriage of Goods by Sea Act (COG-SA), 46 U.S.C. § 1300 *et seq.*

Under the provisions of COGSA the burden of production as well as the burden of persuasion may rest with either party depending on the circumstances involved and the defenses or exceptions raised by the carrier. This shifting of burdens has been often described as a "ping-pong volley-like exchange." *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 719 (1st Cir. 1984); *EAC Timberlane v. Pisces, Ltd.,* 580 F.Supp. 99, 114 (D.P.R.1983); *see also Nitram, Inc. v. Cretan Life,* 599 F.2d 1359, 1373 (5th Cir.1979).

Initially, the shipper must establish a prima facie case, i.e., that the goods were damaged while in the possession of the

carrier. This burden is met by establishing the good condition of the cargo upon delivery to the carrier and the damaged condition of the cargo at outturn. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 351–352 (2nd Cir.1981); *United States v. Lykes Bros. Steamship Co., Inc.*, 511 F.2d 218, 223 (5th Cir.1975).

■ If the shipper is able to establish a prima facie case, the carrier must assume the burden of production, *Florencio Roman v. Puerto Rico Maritime Shipping*, 454 F.Supp. 521, 526 (D.P.R.1978), and present what has been described as "explanatory evidence," Gilmore & Black, *The Law of Admiralty*, § 3–43 (2nd ed. 1975), establishing either that the damage falls within one of the exceptions contained in section 4(2)(a) to (p) of COGSA, 46 U.S.C. § 1304(2)(a) to (p), in which case the shipper must assume the burden of persuasion as to the carrier's negligence or contributing fault; or that the damage was due to the unseaworthiness of the ship, section 4(1) of COGSA, 46 U.S.C. § 1304(1), or falls under the omnibus exception, section 4(2)(q) of COGSA, 46 U.S.C. § 1304(2)(q), in which case the carrier must assume the burden of persuasion regarding its freedom from fault. *Quaker Oats Co. v. M/V Torvanger*, 734 F.2d 238, 240–241 (5th Cir.1984); *see also* Gilmore & Black, *supra; EAC Timberlane*, 745 F.2d at 720 (noting that the omnibus or "q" clause exemption, 46 U.S.C. § 1304(2)(q), imposes upon defendant the most demanding burden under maritime law, i.e., the burden of persuasion, whereas other defenses impose only a burden of production).

■ Plaintiffs met their burden of establishing a prima facie case. Although unable to rely upon the clean bill of lading issued by Sea-Land because the goods had been packed and stowed by the shipper in the container prior to delivery to Sea-Land, *Caemint Food*, 647 F.2d at 352, plaintiffs presented credible testimony regarding the processing and handling of the meat in question and its good condition upon stowage in the container and subsequent delivery to Sea-Land. The damaged condition of the meat upon inspection by the United States Department of Agriculture in San Juan on September 6, 1985, is not in dispute.

Sea-Land argues that delivery occurred on or about August 19, 1985, at which time consignee had notice of the arrival of the goods with reasonable opportunity to receive the shipment, and not on September 5, 1985, when actual physical transfer of the goods to consignee took place. In so doing, it relies upon *Lithotip, C.A. v. S.S. Guarico*, 592 F.Supp. 1280 (S.D.N.Y.1984); *Lithotip, C.A. v. S.S. Guarico*, 569 F.Supp. 837 (S.D.N.Y.1983); and *National Packaging Corporation v. Nippon Yusen Kaisha*, 354 F.Supp. 986 (N.D.Cal.1972). Thus Sea-Land contends that plaintiff must establish the damaged condition of the goods as of August 19, 1985, and may not rely upon the condition of the cargo on September 6, 1985, to establish a prima facie case. Clause 11 of Sea-Land's bill of lading reads in part as follows: "At ports where Carrier delivers goods to consignee, if the consignee does not take delivery as soon as the goods are ready, the goods shall thereafter be at their own risk and expense." In view of the findings of fact and further conclusions of law reached, it is unnecessary to resolve this issue.

■ A prima facie case having been established, Sea-Land met its burden of production by bringing evidence that the damage suffered by the goods falls within the following COGSA exemptions for which neither the carrier nor the ship is responsible:

Section 4(2)(i): Act or omission of this shipper or owner of the goods, his agent or representative. 46 U.S.C. § 1304(2)(i). Section 4(2)(n): Insufficiency of packing. 46 U.S.C. § 1304(2)(n).

Stowing boxes in the container 9 layers high when each box weighed in excess of 55 pounds placed loads of at least 440, 385 and 330 pounds respectively on the ninth, eighth, and seventh layers of the stow. In addition, there were sixteen more boxes on top of the nine layers. These boxes must have further increased the weight overload. Clearly, this far exceeded the boxes' verti-

cal loading capacity of 275 pounds and resulted in the smashing and crushing of the bottom three layers of cargo. Failure to provide bracing to the stowed boxes resulted in greater shifting of the cargo as the boxes in the three bottom layers gave way under the weight of the overlying boxes.

Failure to promptly accept delivery of the cargo upon arrival in San Juan allowed 47 days to pass from the date the first cattle was slaughtered, July 22, 1985, to the date the cargo was inspected, September 6, 1985. This is in excess of the lower limit of the critical period of six weeks during which fresh beef remains in good condition and places the condition of the cargo in doubt even when handled properly.

Sea-Land having produced evidence that the damage suffered by the cargo falls under the exceptions contained in sections 4(2)(i) and (n) of COGSA, 46 U.S.C. § 1304(2)(i), (n), the burden of persuasion regarding the carrier's negligence or contributing fault remained with plaintiffs.

In attempting to meet its burden, plaintiffs presented evidence regarding a five-inch diameter conical hole in the wall of the container and a loose dust seal on the bottom side of the right door of the container.

These alleged defects did not exist when the container was received and inspected by Alus. Their existence upon unloading gives no indication of when the defects had developed nor that they had in fact developed while the container was in Sea-Land's possession. The hole, had it existed through the voyage, may or may not have affected the container's ability to maintain the requested temperature of 31 degrees Fahrenheit. An expert witness was not able to state whether the alleged defect had in fact affected the temperature maintained inside the container. On the other hand, no evidence was presented by plaintiff which would support a finding that the damage suffered by the cargo was in any way caused by or contributed to by the readings of 40, 40 and 46 degrees Fahrenheit. The damage suffered by the cargo, i.e., crushing of the boxes which resulted in the rupture of various cry-o-vac bags, was not shown to have any relation to the temperatures maintained inside the container. The damaged door gasket likewise is unrelated to the plain fact that the boxes were crushed and the meat exposed because there was too much weight loaded on top of them.

We thus find that plaintiffs have failed to meet their burden of persuasion regarding Sea-Land's negligence or contributory fault. Although defendants did breach the carriage contract in allowing the temperature to rise above the level specified in the bill of lading, plaintiff did not, and considering the evidence of improper packing, could not show that this breach was the cause of or contributed to the damage. The damage suffered by the cargo is found to have been caused solely by the shipper's act of stowing the cargo to a height exceeding the underlying boxes' capacity. Further contributing to the damage was Packers' failure to pick up the cargo promptly upon arrival placing the cargo in the critical period of spoilage. For these reasons, Judgment shall be entered in favor of the defendant dismissing the Complaint.

The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.