**EAC TIMBERLANE, Subsidiary of East Asiatic Company, Inc.; Agencia Aduanal Gonzalez De Castilla, S.C.S.A. De C.F., Plaintiffs,**

v.

**PISCES, LTD.; Transportacion Maritima Mexicana, S.A.; Laeisz Maritime Trading Co., Ltd.; and the United Kingdom Mutual Steamship Assurance Association (Bermuda), Limited, Defendants,**

and

**Grolier Comercio E Importacao De Livros, Ltd.; Merck, Sharpe & Dohme De Mexico, S.A. De C.F.; Grolier, S.A.; Seguros La Provincial, S.A.; Seguros La Republica, S.A.; La Interamericana S.A. Cia. De Seguros; Enrique Barros Castelazo; Festo Pneumatic, S.A., Jose A. Rizo Padilla; Seguros La Comercial, S.A.; La Libertad Compañia General De Seguros, S.A.; Seguros La Equitativa Bch, S.A., Intervenors.**

**In the Matter of the Complaint of PISCES, LTD., as Owner, and Transportacion Maritima Mexicana, S.A., as Bareboat Charterer of the Motor Vessel Eva Maria For Exoneration From or Limitation of Liability, Petitioners.**

Civ. Nos. 78–0152CC, 78–1408CC.

United States District Court,
D. Puerto Rico.

June 16, 1983.

As Amended June 28, 1983.

---

Antonio M. Bird, Bird & Bird, San Juan, P.R., for plaintiffs.

José A. Fusté, Jimenez & Fusté, San Juan, P.R., for defendants.

## MEMORANDUM OPINION AND ORDER

CEREZO, District Judge.

On January 25, 1978, at approximately twenty minutes before midnight, a massive explosion shattered the hull of the motor vessel EVA MARIA severing its bow and eventually sinking it with all its cargo. Fortunately, there was no loss of life. This casualty originated the present consolidated cases which consist of a complaint, brought pursuant to the applicable provisions of the Carriage of Goods by Sea Act (COGSA) 46 U.S.C. Secs. 1300, et seq., and pertinent case law, for cargo loss by the consignees, shippers and owners of most of the lost cargo and their insurance companies [1] the plaintiffs and intervenors in Civil No. 78–0152 (herein referred to as either cargo interests, cargo, plaintiff-claimants and/or shippers). These cargo claims were filed against defendants Pisces, Ltd., the Liberian corporation owner of the vessel; Transportación Marítima Mexicana, S.A. (TMMex), the vessel's lessee and parent corporation of Pisces, Ltd.; Laeisz Maritime Trading Co., Ltd. hired by TMMex to navigate and operate the M/V EVA MARIA and their insurance company, United Kingdom Mutual Steam Ship Owners Assurance Association (Bermuda) Ltd. One of these defendants (hereinafter referred to as either defendant-petitioners or carriers) TMMex, filed a counterclaim to recover unpaid freight. Defendants Pisces, Ltd., as owner, and TMMex, as charterer of the

---

**1.** EAC Timberlane; José A. Rizo Padilla; Merck, Sharpe & Dohme de Mexico, S.A. de C.F.; Grolier, S.A.; Seguros La Provincial, S.A.; Seguros La República, S.A.; La Interamericana, S.A. Cía de Seguros; Enrique Barros Castelazo; Festo Pneumatic, S.A.; Seguros La Comercial, S.A.; La Libertad Compañía General de Seguros, S.A.; Seguros Equitativa BCH, S.A. The claims of the plaintiffs-claimants herewith total approximately $1.9 million dollars.

M/V EVA MARIA, later filed a petition for exoneration from or limitation of liability under the Limitation of Liability Act (Limitation Act), 46 U.S.C. Secs. 181–189, Civil 78–1408, which was consolidated with the cargo claims.

The parties agree that the M/V EVA MARIA sank because of a massive explosion of a shipment of detonator caps it was carrying on board. The threshold issue to be determined is what activated the detonators that exploded. The theory of the cargo claimants is that they were activated by the impact of two adjacent road graders which came loose due to improper storage. The carriers attribute the detonators' activation to spontaneous self-heating in the cushioning material used in their packaging. Trial was held during the period of November 2 to November 6, 1981. After examining the evidence presented during trial, the transcript of the proceedings, the entire record before us and the extensive memoranda filed by both parties, the Court makes the following relevant:

## FINDINGS OF FACT

1. The M/V EVA MARIA was a general purpose cargo ship built in the Federal Republic of Germany by the Seebeckwerft shipyards under the supervision of Det Norske Veritas surveyors, a Norwegian classification society. Upon completion of the hull in 1971, the ship was awarded the Det Norske Veritas' highest class designation and remained classed with said society all throughout its life. The M/V EVA MARIA was well maintained and repaired by both its owners; initially, a Norwegian shipowner, and, since 1975, by petitioner Pisces, Ltd. who registered the vessel under the Liberian flag.

2. The M/V EVA MARIA was the Seebeck type 36L model, a medium size cargo ship of approximately 491 feet in length having an approximate gross registered tonnage of 9900t. The vessel had five cargo holds which, together with the engine room, for purposes of illustration could be said to have divided the hull into six parts of more or less equal proportion. Cargo hold number one was the closest to the ship's bow. It was immediately followed in a bow to stern direction by hold number two and so on until hold number five. Right on the stern of the vessel and immediately after hold number five were the engine room, bridge and crew's quarters. The ship had various cranes and masts on deck between the cargo holds. Each of the holds had a tween deck which communicated with the lower portion of the hold and with the deck by folding McGregor type metal hatch covers.

3. There is no dispute that the EVA MARIA at the time of the explosion had adequate fire fighting equipment and a functioning fire alarm system. Its other equipment and machinery, including its cargo holds ventilating system, were also adequate and functioning properly. It was also shown that the stability or metacentric height of the vessel was not of a value that would produce any unusual rolling or motion of the ship during its ocean voyage.

4. The ill-fated voyage of the EVA MARIA started on January 6, 1978 when it left the port of Santos, Brazil destined to the Mexican ports of Veracruz and Tampico via San Juan, Puerto Rico. After an uneventful trip where it encountered mostly slight to moderate swells of three to five feet, moderate breezes of eleven to fifteen knots and temperatures which never exceeded 31°C, the vessel entered San Juan Bay on January 16, 1978.

5. While docked in San Juan, the United States Coast Guard boarded the vessel for an inspection specifically related to the cargo of detonators. The Coast Guard fined TMMex for violations of 33 CFR 124.-14(a)(1) (failure to give advance notice of arrival to a U.S. port of a vessel laden with explosives) and 49 CFR 179.30(b) (failure to list commodity on dangerous cargo manifest in the English language). The Coast Guard made checks for proper stowage and separation of the explosives and found everything else in compliance. It should be mentioned that the forward portion of the number two tween deck containing 38,415 bags of yellow corn was emptied and off

loaded in San Juan. Before leaving San Juan on January 20, 1978 a change of command took place—Capt. Peter Lunau replaced Capt. ULF E. Mahnke for the San Juan-Veracruz leg. On the voyage to Veracruz, aside from a brief mid-ocean stop to repair the engines, there were no particular incidents until the 25th of January.

6. On the morning of January 25, 1978, a boat and fire drill was carried out by the crew and performed without incident. At about 1600 hours the ocean swells and wind speed started picking up. According to the logbook annotations, the waves were scale six, a condition described on the logbook's Sea Disturbance Scale as "rough," wave height crest to trough, 8–12 feet, and the wind was scale 7 or of near gale intensity (27–33 knots) per the Beaufort scale. At 1900 hours the recording officer noted: "Ship is rolling heavily (max. 20°) in NNW'ly swell and seas, sometimes seawater on deck and deck cargo." The ship's chief officer later explained that the wave and wind activity decreased substantially after the 1900 annotation.

7. At 23:40 the ship was violently shattered by a massive explosion. The explosion practically severed the vessel's bow from the number two hold onward. According to the officer's testimony, they heard a loud explosion which damaged parts of their quarters and immediately saw a huge wall of fire higher than the remaining middle mast extending athwart over the entire deck. Nothing forward of hold number four could be seen because of the flames. Contemporaneously with the blast, the vessel's forward section went down in a jerky manner and the rest of the hull started to take in seawater. The officers assessed the damage immediately and tried to fight the fire. It was hopeless. The crew was gathered and put to lifeboats where they watched the EVA MARIA burn and gradually take in water. On January 26, 1978 at 11:20 the vessel rolled over completely on its side and sank. The crew drifted in their lifeboats for two days until they sighted the lights of a Mexican oil drilling platform and reached it safely. There is no question that the evacuation of the vessel was performed diligently and that there was no way of controlling the fire or of saving the ship.

8. The shipment of detonators which exploded consisted of one million aluminum cylinders about 1¾ inches long and ¼ inch in diameter, closed at one end. Each cylinder or cap was partly filled in its closed end with explosive powder consisting of a base charge of 7.7 grams of P.E.T.N. with about 8% TNT to provide stabilizing effect and a primer/ignition charge of a mixture of 4.6 grains of lead azide and lead styphnate (75% and 25%, respectively). The detonators were designed to be activated by fire in the following manner: a fuse is inserted into the cylinder until it makes contact with the explosive powder and it is then clamped with a special tool that bends the cylinder slightly. The fuse is then lit and starts burning until it reaches the cylinder and activates the explosives.

9. The detonators were manufactured by Industrias Químicas Mantiqueiras, S.A. of Lorena, Brazil.[2] Said firm was visited by defendant-petitioners' attorneys and experts about nine months after the casualty. On this first visit the carriers' explosives expert, Mr. Dolph Campbell, noticed several irregularities at the explosives plant which led him to believe that the possibility existed that the factory employees were not exercising proper controls concerning the safety of the commodity. These irregularities consisted mainly of the following: uncontrolled access to the plant, lack of knowledge of the plant manager on how the detonators were handled after they left the factory, discovery of a bent detonator cap on the floor and of a paper clip inside a detonator box, wooden detonator crates were being assembled with ferrous nails and screws and exposure of the rice hulls used for cushioning since they were piled on the ground. Although the plant manager told him offhand that the manufacturers had never had an accident in twenty-nine

2. Not a party to neither of the actions.

years of shipments of explosives prior to the EVA MARIA disaster, Mr. Campbell had never seen this type of agricultural material used as cushioning for explosives. It was never made clear whether in those twenty-nine years the manufacturers had always used the same type of cushioning material. The irregularities observed by him were never seriously questioned by the shippers.

10. In addition to these unsafe conditions at the plant, upon visiting the warehouse in Santos where Industrias Mantiqueiras had sent the detonators to be stored while awaiting shipment, he found another set of conditions which reinforced his belief that adequate controls on the safety of the explosives were lacking. The warehouse used by the manufacturers to store the explosives was located in an area in downtown Santos where individuals of questionable aspect (described by Mr. Campbell as "degenerates") abounded, the entrance door could not be locked, the windows were broken, there were holes in the roof, the back door did not appear to be locked and there were bags of oxalic acid stored at the time of the visit suggesting that the warehouse was used to store all types of materials.

11. These observations were confirmed by a second visit during August of 1981 when another of the carriers' experts, Mr. Jack Willems, noticed that the conditions of the Santos warehouse were as described by Mr. Campbell.

12. Willems also visited the explosives factory at Lorena to obtain a sample of the cushioning material. There he was given a sample and directed to some of the rice mills that supplied the material. He visited one of these and noticed that small and old rice mills were used to mill the grain and that the bags containing rice husks were placed in an alley exposed to the elements. Some of these bags were marked as fertilizer bags. It was reasonably inferred by the witness that they may have been previously used to pack fertilizers. Both Willems and Campbell concluded that the conditions in Brazil made it probable for the detonators to have been exposed to humidity and contamination from foreign materials.

13. The 1,000,000 detonators were packed in 100 wooden cases, with each case containing 10,000 detonators. Each wooden case contained 10 intermediate cartons with 1,000 detonators each. Within each intermediate carton, there were ten cardboard boxes, each containing 100 detonators. The cardboard boxes were divided into two tiers of five boxes, and each tier was wrapped in a polyethylene cover. The wooden crates had an inner lining made of Masonite and the void space between the lining and the outside of the box was filled with the rice hull cushioning material.

14. The shipment of detonators was stored at the expense of the manufacturers at the warehouse in Santos, Brazil for thirty-seven days before it was loaded on the EVA MARIA. The temperatures at Santos during this period fluctuated between 20°C–29°C and the relative humidity varied from 58% to a high of 100%, averaging at approximately 70% during the month of December 1977.

15. When the carriers received the detonators they acknowledged that they were in apparent good order and condition. However, by the external appearance of this cargo and the information contained in its accompanying documents, the carriers had no way of knowing, nor were they reasonably induced to suspect, that the internal packing of the detonators was in any manner improper, dangerous or in violation of any applicable statute, rule, regulation or treaty.

16. The carriers hired an independent marine surveyor to deal specifically with the stowage of this dangerous cargo. The surveyor discussed his recommendations with the ship's officers, visited the EVA MARIA, and examined the general stowage plan. He recommended that a wooden chamber be constructed to isolate the detonators from the rest of the cargo. It was determined that the ship's hold where this wooden locker was to be erected would be the number two tween deck at the aft port

side corner. Although the surveyor was not present when the cargo of detonators was loaded, they were placed in the number two hold according to the stowage plans that he had examined and a wooden locker was built by shoreside carpenters around the crates of detonators to isolate them, as recommended by him.

17. The rest of the cargo in hold number two was also stowed according to the general cargo plans. The locker was stowed between two Caterpillar model 120G, twelve ton motor graders stowed in the middle of the hold and a shipment of crated, palletized, non-gaseous TV tubes were placed immediately adjacent to the portside bulkhead. The forward section of the hold was filled with the cargo of corn that was to be off loaded in San Juan. The detonator crates were the last items to be loaded in tween deck number two.

18. There was some conflict as the version regarding the lashing method of these items given by the officers of the ship who supervised the stowage and who performed daily inspections of cargo during the voyage differed from the version offered by Mr. José Goncalvez Neto, the Brazilian independent stevedore foreman in charge of the lashing operation itself. The Court finds that the foreman's version has the best probabilities of being correct since he was the person who came in closest and direct contact with the actual lashing of the cargo on hold number two. We, therefore, adopt Mr. Goncalvez' description of the mode of lashing as the more precise and correct version.

19. The crate of TV tubes was lashed with three wires affixed with turnbuckles to the port and aft side of the hold's bulkhead. The detonator locker was lashed with two wires affixed with turnbuckles running over the top of the locker from the aft bulkhead to a padeye on the floor and with two wires from the aft bulkhead running around the sides of the locker and again to the aft bulkhead. A wooden beam was nailed to a corner of the locker which rested against the floor in a slanted manner so as to exert pressure against the forward and side movements of the locker. The detonator locker and the crate of tubes rested on various pieces of lumber.

20. The motor graders were manufactured by Caterpillar Tractor Co. Each weighed 11.7 tons.[3] They were stowed in a fore and aft position, the front part of the machines facing the vessel's bow and the back part facing stern. They were placed on top of the McGregor hatch covers about six feet away from the detonator locker. The graders' braking and steering systems were powered by hydraulic pumps and had separate parking and emergency brakes. According to stevedore Goncalvez and Chief Officer Hill, in order to prevent any possible movement of the graders, their tires were jammed and secured by pulling on the brakes, the transmission was blocked by placing it in gear and the batteries and fuel were removed from the graders.

21. Stevedore foreman Goncalvez, who had previously lashed more than 300 machines of this type, specified that each grader was lashed individually with twelve steel cables and turnbuckles to padeyes welded to the closed hatch covers on the hold's floor. The cables were attached to various points on the machines. Each grader was chocked with pegs of lumber nailed around the wheels and under parts of the graders. The blade of each grader also rested on pieces of lumber. The shippers' stowage expert questioned allowing other parts of the machines to rest on tires instead of wood.

22. During the voyage, Chief Officer Hill made daily rounds of the holds to inspect the cargo's condition. On the afternoon before the casualty, he found that another grader which had been stowed in hold number four needed relashing. According to stevedore Goncalvez, the grader in hold number four was secured with less

---

**3.** Neither the manufacturer, owner, shipper nor consignee of these graders was a party to any of these actions.

lashings than those in hold two. Officer Hill explained that by "relashing" he meant that he retightened some of the lashings and turnbuckles on the grader in hold four. None of the lashings on that grader had broken nor had it moved out of place. The bosun that accompanied Chief Officer Hill also retightened, at his own initiative, a roller machine in hold number four although the officer did not think it necessary. Hill examined the rest of the cargo, including that of the number two hold, at about 1800 hours. All was in order; the lashings on that cargo were all tight. It took two hours for Hill to retighten the turnbuckles on the grader in hold four and to examine the rest of cargo in the holds. The shippers' expert on stowage also questioned the time it took to retighten as being too long.

We shall examine the theories of the respective parties against this factual framework.

23. The carriers' theory rested on the phenomena known as spontaneous combustion, a process which is described by Dr. C.M. Christensen in defendant-petitioners' exhibit P–3 as follows:

#### Microbiological Heating in Agricultural Materials

#### by

#### C.M. Christensen

#### Introduction

Heating caused by molds or fungi, and bacteria, growing in plant materials and plant products is a common phenomenon, and because it sometimes results in fires, with consequent economic loss, it has been investigated by many different workers in several countries over the past hundred years, and the processes involved are fairly well known. So-called "spontaneous combustion" in plant materials is a product of this microbiological heating, and is fairly common in stored hay, in manure piles, in large bulks of soybeans and other oil seeds, in baled wook, and occurs occasionally in non-oily materials such as spent brewers' grains, in piles of wood chips stored for manufacture of paper, and in baled cotton.

#### Conditions Necessary for Microbiological Heating

The requirements for microbiological heating are:

1) Material in which molds and bacteria can grow readily. Most plant materials and plant products furnish a suitable substrate for growth of the molds and bacteria that cause heating.

2) Moisture. For detectable heating to occur, the materials in which the molds and bacteria are growing must be moist. Not soaking wet, just moist. In cereal grains, cereal products, and most other plant materials, a moisture content of 18–20%, wet weight basis, is sufficient for the rapid microbial growth that engenders heating.

3) Air (oxygen). The molds and bacteria that cause heating require oxygen to grow and produce heat, the same as we do. They do not require much air, but some air is necessary. Fairly tightly closed containers such as ship holds or grain storage tanks furnish sufficient circulation of air to promote microbiological heating.

4) A bulk large enough to provide sufficient insulation so that the heat produced will accumulate, and not be dissipated to the ambient air. Manure piles amounting to only a few cubic yards have heated to ignition. If the material undergoing microbiological heating is fairly well insulated and in a warm place, such as a closed ship hold under a tropical sun, a bulk of a few cubic yards will be sufficient to permit the heating to progress to as high a temperature as can be generated.

#### The Heating Process

Typically and normally (and in my experience with heating grains and seeds and feeds, almost inevitably) the heating gets under way with the growth of specific kinds of molds, namely *Aspergillus candidus* and *Aspergillus flavus*. Un-

der circumstances that permit their rapid growth (a moisture content over 18%, some air, a moderately large bulk to furnish insulation) these two heat-tolerant species can raise the temperature up to 130 F in a few days (or even overnight) and keep it there for several weeks. They are then followed by other fungi that carry the temperature up to about 150 F. These in turn are followed by thermophilic (heat-tolerant or heat-loving) bacteria that raise the temperature up to 170 F, the maximum they can endure. This is as high a temperature as can be produced by microbiological heating alone. Once that temperature is reached in the heating material and held there for a few days to a few weeks, there are two possible courses:

1) The bacterial exhaust the food material available to them, cease growing, and the temperature gradually decreases, or:

2) Purely chemical heating takes over, and may increase the temperature to that necessary for ignition. In all cereal products which I have tested, this ignition temperature is about 700 F. This purely chemical heating presumably results from oxidation of hydrocarbon compounds produced by the bacteria, and which have a low ignition temperature. Once this chemical process gets under way, the temperature rises rapidly.

The process outlined is not hit-or-miss; but is, so to speak, pre-programmed, to the extent that the purely chemical heating will not occur without the previous heating by bacteria, and the heating by bacteria will not occur unless it has been preceded by the heating by fungi. To recapitulate, fungi or molds carry the temperature up to 150 F, followed by bacteria that carry it up to 170 F, followed (sometimes) by chemical processes that may carry it up to ignition. Why the final stage of microbiological heating, by bacteria, up to 170 F is sometimes followed by purely chemical heating, and sometimes is not, is not known.

24. To explore the possibility of said phenomena taking place in the cushioning material used in packaging the detonators, the samples obtained by Mr. Jack Willems on August 1981 at the explosives manufacturing plant and at the rice mill in Brazil were examined. Part of the samples were taken to Dr. R.F. Milton's laboratories in London and the rest to the Royal Committee of Grain in Rotterdam, Holland. The Royal Committee issued a Certificate of Analysis which showed that the sample was put through a 1 mm seave and 20% of it fell through the seave. This fine material that fell through had a fat or oil content of 6.43%. The remaining 80% was analyzed and found to consist of 41.2% rice husks; 13.2% paddy rice; 12.24% whole kernels; 7.12% broken rice and 6.24% foreign material including insects and other types of organisms. The fat or oil content of the 80% portion was 1.61% and the overall content of the sample was 2.57%.

25. Defendant-petitioners' expert biochemist Dr. R.F. Milton conducted several tests with the sample to see if it had the propensity for self-heating. Dr. Milton prepared samples with different moisture contents and heated them. The results indicated that the internal temperatures of the material increased daily and surpassed the external temperature until they leveled off at 35.5°C. Similar results were obtained by Mr. Arcángel Rodríguez, a plant pathologist at the Agricultural Station at the University of Puerto Rico, with a reconstituted Puerto Rican rice sample. These results led Dr. Milton to conclude that the material had the propensity for microbiological self-heating.

26. Dr. Milton then carried out another experiment called the Mackay test which is designed to indicate whether a substance has any properties which would allow the second stage of self-heating—chemical oxidation—to develop. The results of this test showed that the material's temperature when exposed to an outside temperature of 100°C rose from 100.9°C to 126.9°C in four hours. This indicated to Dr. Milton that besides microbiological activity the material also had the propensity for chemical heat up.

27. On the basis of these tests, Dr. Milton concluded that the sample material, which he classified as improperly milled rice grain, had foreign matter capable of developing the biological and chemical processes required for spontaneous combustion and would therefore be included as "Substances Liable to Spontaneous Combustion" as classified in Sec. 4.2 of the International Maritime Dangerous Goods Code. He considered that the conditions surrounding the packaging and shipment of detonators in this case had the necessary elements for the development of the spontaneous heating phenomena. These conditions were, in essence, that: the rice hulls contained materials in which molds and bacteria could grow and produce heat; the relative humidity encountered during the thirty-seven day storage on the partially dilapidated warehouse and during the voyage through tropical seas were also appropriate for the growth of mold and bacteria; the closed container, such as a ship's hold with a ventilating system, furnished sufficient circulation of oxygen to promote self-heating and the detonator's approximately four pounds per crate of cushioning material was sufficient bulk, given the practically insulated condition of the detonator stow and the high temperatures there encountered, for the development of spontaneous self-heating. Dr. Milton indicated that he had witnessed spontaneous combustion on small bulks, if properly insulated.

28. It was demonstrated to the Court that the lowest temperature required to activate the explosives was 145°C for forty-seven minutes and forty-five seconds. The experts indicated that spontaneous combustion occurs at 390°C but self-heating during the chemical process can take the temperature beyond 146°C and hold it there for a few days or weeks. This process could have been taking place inside the crates without raising the external temperature and activating the fire or smoke detection system. In fact, Dr. Milton mentioned that sometimes cargo which had been smouldering for a long time with internal heat would burst into flames as it became exposed to air when being unloaded without any external heat or smoke having been noticed before. Based on his observations and on these experiments, Dr. Milton concluded that the most probable explanation for the explosion was the gradual internal heating of the cushioning material in the detonator crates which eventually reached a temperature that activated the detonators into a massive explosion.

29. The plaintiff-claimants' theory of causation rested on the synergistic effect of many combined factors regarding the lashing of the motor graders in hold number two and the forces caused by the ship's motions on the lashings. Since we have already expressed our finding in relation to the lashing of the graders, we shall now address the theories of the ship's motions and forces.

30. A maximum roll of twenty degrees was reported in the vessel's log book for January 25, 1978. The weight of the evidence is to the effect that the roll-angle entry made in the ship's log was taken from the inclinometer on the EVA MARIA's bridge. The evidence also showed that there is a difference between roll angles based on inclinometer readings taken while the ship is moving through the ocean and the true angle of inclination since an inclinometer is an instrument used to measure heel under static conditions. A ship moving in a seaway experiences dynamic accelerations. These accelerations are greatest for the motions of pitch and heave. The accelerations due to rolling are greatest when the ship's rolling period is shorter and when long distances from the ship's center of gravity are considered. In the instant case, the inclinometer was located on the bridge, several deck levels above the ship's center of gravity, thus making the roll readings taken from the inclinometer greater than the actual roll experienced by the ship.

31. In order to determine the actual roll experienced during the voyage between San Juan and Veracruz, the ship's stability condition during the voyage was evaluated. Stability calculations were carried out for the ship as of January 25, 1978. In so

doing, the deck log book, stowage plan, stability booklet dated June 13, 1977, and the arrangement and capacity plans for the vessel were considered as well as the remaining cargoes on board. This information was used to obtain the metacentric height of the vessel which together with the roll period estimate revealed that the roll angle, as read from the inclinometer, would be approximately twice the actual angle experienced by the ship.

32. Another study on ship motion was conducted by Hoffman Maritime Consultants under the supervision of Naval Architect and Marine Engineer John Deck who testified at trial. This study was based on observed data collected throughout the years and analyzed by a computer in a statistical approach. The Hoffman Maritime Consultants' motions study shows that the motions and accelerations of the vessel during the weather encountered prior to and at the time of the casualty were about 64% of the maximum motions and accelerations that could be expected in a twenty-five year life and were 59% of the maximum roll response that could have been experienced in the actual weather recorded in late January from 1956 to 1975 at the Observatory at Isla Pérez, close to the site of the casualty. As shown by Mr. Deck in the graph entitled "Roll Maximum in Four Years, EVA MARIA, Isla Pérez Area Spectra," the maximum roll angle, utilizing a five-meter significant wave height, was shown to be 17 degrees during the four hours in beam seas from the time period of 1600 to 2000 hours on the day of the disaster. This means that the ship could have encountered a single roll in that time period equivalent to a maximum of 17 degrees. However, the average rolls were determined to be approximately 12 degrees. Because there was a change in the ship's course at 2000 hours which brought the seas thirty degrees off of the beam, there was a change in the vessel responses. Accordingly, it was determined that the maximum roll angle was 12.5 degrees in four hours during the 2000 to 2300 hours time period. The calculations on stability and roll periods as well as the Hoffman statistical study were performed at the request of defendant-petitioners.

33. Plaintiff-claimants' study on ship motion, which was also a computer assisted statistical approach, arrived at a maximum roll angle of 13.9 and was conducted by David Seymour a Naval Architect and Marine Engineer who also testified at trial. Mr. Seymour had previously indicated by way of deposition that the 20° roll reading on the inclinometer needed no corrections and that he did not know the degree of error of said reading. He stated that a computer-assisted study, which he had not performed at the time of his deposition, would not reduce the 20° figure but would probably increase it. Mr. Seymour used this 20° angle for his initial motion study but at the time of trial abandoned it and presented the computer-assisted study. During trial he referred to the 20° roll angle on various occasions when being presented with on the stand calculations.

34. The significant wave height used for this study was eighteen feet. This wave height was arrived at by super-imposing the wind speed and wave data on the log book, the conclusions of Professor William L. Donn, a meterologist from Columbia University, N.Y., hired by the shippers, on a scale of tables of waves and other hydrodynamic data. The wave height and wind speed information in the log book we have already indicated. Professor Donn's conclusion was to the effect that the ocean activity was typical for that part of the Gulf of Mexico during January. He calculated the wave height encountered by the M/V EVA MARIA at six to nine feet although mariners in the area reported waves ten to fifteen feet high. From the log-book data and Professor Donn's report, Mr. Seymour arrived at a wave height of sixteen feet which he incorporated to the tables and scales derived from mathematical calculation of estimated wind and wave patterns. Mr. Seymour indicated during cross-examination that he did not know that the EVA MARIA's last logged position was erroneous. He indicated that the weather at the location of the vessel was

not important nor necessary for his mathematical calculations. Mr. Seymour also did not consider Officer Hill's testimony to the effect that the wave height decreased three hours before the accident. He did not find it necessary to read Chief Officer Hill's deposition.

35. Mr. Seymour then used this ship's motion calculations and applied it to the lashing arrangement he considered relevant and arrived at the forces being exerted on the wires. He adopted one of the ship officer's version of the two graders being lashed together with only four wires at the sides. The expert decided to adopt this version because he assumed the ship officers had more experience than the Brazilian stevedore foreman. He never read the depositions of these officers nor the deposition of the stevedore foreman who supervised the operation and who indicated that he had lashed more than 300 machines of that type. There was no mention of the effect of the wood chocking arrangement explained in Goncalvez' deposition nor was it considered in Mr. Seymour's calculations. Seymour classified the lashing versions into two: the graders lashed individually (Goncalvez' version) and the graders lashed together (ship officer's version). He based this classification on the sketches accompanying the depositions which show the graders sometimes lashed with more than four wires on the side. The sketches were explained in the depositions which Mr. Seymour did not read.

36. During trial, Mr. Seymour expressed that he started making calculations for the single lashed grader version of Goncalvez but later discarded it. While testifying on redirect he looked at a sketch made by Goncalvez and again, without making reference to the explanatory deposition, concluded that the angle of the wires lashing the aft of the graders would "probably" have conflicted with the tires if they had been lashed individually. This together with the "more experienced officers" rationale were the reasons propounded by Mr. Seymour for abandoning the other lashing arrangement for his study and concentrating only on one. He also indicated that he considered only the four lashings on the side of the graders as effective against roll movement, the only ship motion he deemed pertinent to the study. Later on in his testimony he indicated that it was less probable that with the individual lashing arrangement of Goncalvez the cargo would develop slack. Nevertheless he quickly mentioned, although his study on this type of lashing arrangement was never completed, that the Goncalvez' individual lashing arrangement would still be in excess of the safe working load and would have resulted in the same casualty.

37. Based on the information on ship motion and the lashing arrangement adopted, Mr. Seymour concluded that a force of 6.64 metric tons was being exerted on each of the four wires. The breaking strength of the cheapest type of wire (which Mr. Seymour assumed together with the quality of turnbuckles and padeyes to have been the ones used by stevedores in Santos, Brazil although he had never been there and did not know the practices of this port) was 11.4 metric tons. Mr. Seymour then devised a safety factor based on certain incidents he considered deficiencies in the stowage. These deficiencies were described as follows: some of the lashings passed over sharp edges of the graders thereby bending the wire and promoting slack; the graders were resting on McGregor-type hatch covers; the padeyes holding the graders were welded on the hatch covers without a certification; the weight of the graders rested on air filled tires and the poor quality of the wires, clips, turnbuckles and padeyes used. Mr. Seymour incorporated these deficiencies into his calculations by adopting a safety factor number of five which he used to divide the breaking strength of the wire. He did not indicate the criteria used to adopt that specific number. The breaking strength was divided by the safety factor of five to arrive at an actual breaking strength of 2.7 metric tons.

38. According to these calculations, the force exerted on the wires would exceed its safe working load allowing the wires to

stretch and permitting slack to build up until the inertia of the graders created a violent snap load. The development of said slack and snap load was translated by Seymour into another numerical factor which he called the snap-load dynamic factor. He assigned a number two to this factor in order to double the weight of the graders and the snap-load force on the lashings. He indicated that there was no particular authority to support the adoption of said factor number and that it could have been 1.5, 1.8 or 2.2.

39. At the time of the trial Mr. Seymour had not made any calculations regarding the dynamic energy of the graders moving across the vessel if all the lashings had parted and the cargo had turned loose. During his testimony at trial he tried to formulate this potential energy by using rough approximations and on the spot estimates. He did not refer to any pieces of evidence or other information to make these calculations. He never carried on his calculations on the stand to estimates regarding the kinetic energy produced by free rolling graders impacting the detonator locker.

40. Finally, Mr. Seymour referred to the incident of the relashing in hold number four as additional support for his theory. He indicated that according to the stowage plan, the log book and an unidentified deposition that he read there was a similar road grader lashed in the tween deck of the number four hold. Based on this information and the location of hold number four near the midship of the hull where it would experience less pitching motion and forces than the number two hold, he concluded that it was highly probable that the graders in hold number two came loose. He did not make any calculations regarding the stowage of the grader in number four hold nor the type of ship motion and intensity that the number four hold would have encountered in comparison with the number two hold. He assumed that the relashing note logged at 1600 consisted of adding some more lashings and wires and he did not examine the deposition

of Officer Hill where this note was explained.

41. The defendant-petitioners' experts on the forces exerted by the ship's motions on the lashings (the McMullen and Deck reports) assumed various stowage arrangements, including the Goncalvez' version. Their conclusions showed that in the worst lashing description, that of Captain Mahnke, the highest tension came out to be some 3.88 tonnes for an 11.8 degree roll and 6.19 tonnes for a 12° roll, well below the 15.6 tonnes breaking strength standard used by them as well as the 11.4 tonnes standard used by Mr. Seymour. This indicated to defendant-petitioners' experts that the minimum number of lashings needed to restrain the motion of the two motor graders would be one lashing on each side of the machines for an 11.8 degree roll or two lashings for a 20 degree roll, assuming the lashings angled at 45° and set 45° to the centerline of the machine, with the lashing abreast of the machine's center of gravity. In the Goncalvez' lashing arrangement, the McMullen report indicated that the highest tension encountered by each wire on an 11.8° roll would have been 1.95 tonnes and 2.96 tonnes for a 20° roll. The report concluded that this made impossible the scenario of consecutive failure of lashings to take place. In the case of the lashings as recalled by Captain Mahnke, the worst possible case, a safety factor of 4.0 for failure of the lashings was present.

42. An additional view on this subject is found in the Failure Mechanism Analysis, Annex on Shock, EVA MARIA Study prepared by John Deck III. Said expert examined first the strength of padeyes welded to the tween deck of the M/V EVA MARIA, using the padeyes found on the M/V JOSEFA, a sistership of the EVA MARIA that he surveyed, as being representative of those that might have been found on the M/V EVA MARIA. Mr. Deck calculated the strength of the padeyes to be 20,000 pounds. Based on a roll angle of 17 degrees and a lateral acceleration .09 G's superimposed on a 26,000 pound weight, the resulting force was calculated to be 10,000 pounds. Based on the lowest

strength of ⅝″ wire (16 mm.) that could be found, that is, galvanized common steel wire, it was concluded that this calculated force would not exceed the breaking strength of one wire.

43. On the subject of forces exerted by the graders on the detonator crate, assuming a free moving cargo situation, the defendant carriers responded to the plaintiff shippers' silence on this last part of their theory by presenting expert witnesses on the forces required to detonate the explosives by impact. A representative sample of the Brazilian detonators was tested by an independent laboratory. It was found that detonators of this type required about 20.1 foot pounds of energy to cause detonation of a single cap between two steel plates. It was also shown by testing that 40.2 foot pounds of energy was insufficient to cause detonation of representative detonators in the packed configuration. These tests translate into an energy density (energy/projected cap area) of 110.5 foot pounds per square inch for the threshold for detonation.

44. It was found that the energy density generated by the grader's nearest part to the locker would have been seven times lower than the threshold value of detonation as shown by the tests. These calculations were made assuming the machines were completely unlashed and rolling freely in the hold. In order for the machines to move as such the carriers' experts, using a coefficient friction between wood and steel that was used in the "Badger State" casualty as indicated by the National Transportation Safety Board's report submitted in evidence, concluded that the vessel had to roll thirty-six degrees. They concluded that it was highly improbable that the graders could have impacted the detonator locker with sufficient force so as to activate the explosives.

Having examined the entire record and based on these findings of fact, we set forth the following:

## CONCLUSIONS OF LAW

■ The law applicable to these cases is the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1300, *et seq.*, the cases interpreting it and other analogous legislation for the cargo claims in Civil 78–0152 and the Limitations of Liability Act, 46 U.S.C. Sec. 181, *et seq.* and interpretative cases for the petition for exoneration or limitation of liability in Civil 78–1408. The Court has jurisdiction in admiralty pursuant to Article III, Section 2, U.S. Constitution and the enabling statutes. The parties have raised the applicability of certain non-admiralty laws for accessory claims and the adoption of a strict liability doctrine to carriage of dangerous goods. The availability to shippers of Puerto Rico's direct action against the insurer, *P.R. Laws Ann.*, Tit. 26, Sec. 2003, will be examined further on in our discussion of the central issues of the cases which are clearly matters of a maritime nature. As to the strict liability argument, the parties have no quarrel with the applicability of the general maritime law to these central issues. This factor, in view of the general well-recognized principle of uniformity in maritime law, *see gen.: Santiago v. Sea Land Services, Inc.*, 366 F.Supp. 1309, 1311–14 (DPR 1973) and cases there cited, prompts us to reject plaintiff-claimants' alternative argument of imposing strict liability on carriers who transport dangerous goods in relation to third-party owners of cargo that was adopted for land carriers (railroads) in *Chavez v. Southern Pacific Transportation Co.*, 413 F.Supp. 1203 (E.D.Cal.1976). Although many concepts from the general common law of torts have been adopted by courts in admiralty when not inconsistent with maritime law, there are no relevant authorities in support of the adoption of the particular theory of strict liability to marine carriers as advocated by cargo-claimants. We hesitate to incorporate it and to possibly alter the established statutory scheme concerning carriage of goods by sea, absent some compelling reason which has not been shown to exist in this case. The maritime cases most resembling plaintiff-claimants' theory of strict liability are those dealing with the imposition of

liability on the carrier for transporting ultra hazardous cargo *vis a vis* that of the manufacturer when the carrier was informed or had reason to know of defects or potentially dangerous conditions in the packaging or stowage of the product which caused or contributed to the damage and did nothing to prevent it. See: *Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 904 (5th Cir.1982); *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir.1978); *Pan Alaska Fisheries, Inc. v. Marine Construction and Design Company*, 565 F.2d 1129, 1234–39 (9th Cir.1977); *Sucrest Corp. v. M/V JENNIFER*, 455 F.Supp. 371, 384–85 (DMe.1978). However, even assuming this standard were to apply in any manner different from the criteria of liability set forth in COGSA, the elements for the imposition of strict liability are not present in this case. There is no need and no justification for us to deviate from the tried and true course plotted by maritime law and to sail, instead, into uncharted waters. The issues in these proceedings fall squarely upon determining whether defendant-petitioners' relationship to the cause of the explosion is one that, according to the standards of diligence imposed on carriers by COGSA, requires that they be found liable to the cargo interests. To make this determination the Court must focus its attention on the analysis of the voluminous evidence to decide, according to the criteria of weighing evidence required by the applicable admiralty law, which of the two theories of causation presented is the most probable explanation for the casualty. Therefore, as remarked by Judge Friendly in the frequently cited case of *Lekas & Drivas, Inc. v. Goulandris*, 306 F.2d 426 (2nd Cir.1962), the "[d]ecision ... turns, as it so often does in claims of this sort, upon the burden of proof." *Id.* at 431.

■ It has long been held that, in cargo claims against common carriers, if a shipper demonstrates a prima facie case of cargo loss or damage, the burden is shifted to the carrier to exonerate itself from liability. *See: Clark v. Barnwell*, 53 U.S. 272, 12 How. 272, 13 L.Ed. 985 (12 How.) (1851);

*Gilmore & Black, The Law of Admiralty*, Sec. 3–43 (2nd Ed.1975). The shipper's initial burden is easily met by the presentation of a timely claim for damaged or lost cargo and a clean bill of lading which creates a rebuttable presumption that the cargo was delivered in good condition. 46 U.S.C. Sec. 1303(4). *Blasser Bros. v. Northern Pan-American Line*, 628 F.2d 376, 381 (5th Cir.1980; *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1373 (5th Cir. 1979). The burden is shifted to the carrier because its position regarding access to and control of the evidence is considered to be the most advantageous once it has been initially demonstrated that the damage probably occurred during shipment. *Schnell v. The Vallescura*, 293 U.S. 296, 303, 55 S.Ct. 194, 195, 79 L.Ed. 373 (1934); *Florencio Román v. Puerto Rico Maritime Shipping Authority*, 454 F.Supp. 521, 525 (DPR 1978).

■ A discussion of burden of proof standards is always tied to an examination of how liability between the particular parties involved is delineated. In the case of cargo claims, it is interesting to note that before the passage of COGSA there were some Supreme Court decisions which placed upon the carrier the difficult task of meeting the prima facie cargo loss claim by having always to show the exertion of due diligence to make the vessel seaworthy, regardless of the causal connection between the unseaworthiness and the damage, before it could raise one of the traditional maritime exemptions from liability. *May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft (The Isis)*, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348 (1933); *The Carib Prince*, 170 U.S. 655, 18 S.Ct. 753, 42 L.Ed. 1181 (1898). Subsequent cases and the adoption of the Hague Rules by the enactment of COGSA clarified the carrier's liability regarding unseaworthiness as one depending on the causal connection between the lack of due diligence to make the ship seaworthy and the damage to cargo. 46 U.S.C. Sec. 1304(1); *e.g.: Lekas v. Drivas*, at 431 and Note, *Cargo Damage at Sea: The Ship's Liability*, 27 Tex.L.Rev.

525, 530 (1949). The carrier can now be found not liable if it can establish that the damage was caused by one of the statutory exemptions, even if the ship was in some other unrelated aspect unseaworthy. *See:* Gilmore & Black, *supra,* at p. 184 and Note, *supra,* at 534 N. 44. In terms of strategies of litigation, this suggests that the carrier may choose to shoulder the burden of demonstrating that the loss falls within one of the exemptions attributed to third party causes. Depending on which exemption it chooses, some of which have been portrayed as either "cause" type or "result" type exemptions, *see:* Note, *supra,* at pp. 532–35, this burden may only require from the carrier that it demonstrate the presence of an extraneous exempting cause or it may require that it also establish its freedom from fault in contributing or causing the loss. Gilmore & Black, *supra.*

■ This initial demonstration by the carrier would serve to shift the burden back to the shipper to establish the carrier's contributory or causative negligence and/or the non-applicability of the exemption. *Id.* and *Blasser Bros.,* 628 F.2d at 382; *J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 588 (2nd Cir.1971). For, even if an exemption applies, the carrier may be liable for that portion of the damages that may be attributed to its fault. *Id.* If the shipper is successful in demonstrating this contributory fault, then the burden would fall again on the carrier to prove, if possible, what portion of the damages are related to its fault. *Id.* and *Lekas & Drivas, Inc.,* 306 F.2d at 432. Once this ping-pong volley-like exchange of burdens, *see: Nirtram, Inc.,* 599 F.2d at 1373, is completed, the court is in a position to examine the quantum of evidence offered, according to the general criteria used in civil cases of preponderance of the evidence, *States Marine Corp. of Del. v. Producers Coop. Packing Co.,* 310 F.2d 206, 212 (9th Cir.1962); *Cargo Carriers v. Brown S.S. Co.,* 95 F.Supp. 288, 292 (WDNY 1950), and decide which of the parties has carried its burden successfully.

In the present case the parties have no quarrel with these general principles. The carriers have accepted that the shippers made out a prima facie case of cargo loss and there is no need to examine the changing burdens in relation to contributory negligence for the theories of liability do not rest on the carrier's possible contributing fault but on mutually exclusive proximate causes. And, since the case is now submitted, the dispute centers not on the appropriate order of proof but in determining if the carrier's burden was adequately fulfilled to the extent of relieving it from liability. The cargo interests, argue that the carrier did not meet this burden and, by concentrating not so much on what the carrier produced but rather on what it failed to produce, seem to portray this burden as one of production *and* persuasion. A burden of production is said to refer to the duty of coming forward with evidence, while a burden of persuasion is considered to be a requirement that a party "convince the finder of fact to a previously specified level of certainty of the truth of an issue." 21, C. Wright & K. Graham, *infra,* Sec. 5122 N. 9 (1982 Supp.). They indicate that the carrier's insufficient and inadequate evidence left many doubts which, in view of their duty to persuade, must be decided against them. The resolution of these doubts against the carriers would then defeat their theories as being non-persuasive and, the shippers conclude, the court would have to find for the cargo interests.

■ The burden of carriers, once a prima facie case of cargo loss is made, seems to have the characteristics of the persuasive type of burden. *Nichimen Company v. M.V. Farland,* 462 F.2d 319, 329, N. 9 (2nd Cir.1972); *The West Kyska,* 155 F.2d 687 (5th Cir.1946); *PPG Industries, Inc. v. Canal Barge Co., Inc.,* 438 F.Supp. 1238, 1241 (W.D.Penn.1977); Gilmore & Black, *supra,* at 168; Note, *supra,* at 534; *contra: Florencio Román,* 454 F.Supp. at 525; *see:* 21, C. Wright & K. Graham, *Federal Practice and Procedure,* Sec. 5123 N. 33 (1977). The carrier's burden has been portrayed as one requiring that it clear doubts as to the

reasons for the loss and its relation with those causes. See: *Commercial Molasses Corp. v. N.Y. Tank Barge Co.*, 314 U.S. 104, 110–11, 62 S.Ct. 156, 160–61, 86 L.Ed. 89 (1941); *Waterman S.S. Corp. v. United States S.R. & M. Co.*, 155 F.2d 687, 693 (5th Cir.1946); *cf.: Dreijer v. Girod Motor Company*, 294 F.2d 549, 550 (5th Cir.1961) (if evidence of a party on whom the burden rests is equally consistent with several different hypotheses no single one is proven). If after all the evidence is presented the carrier leaves doubts as to the cause of the damage, they must be resolved against it. *Commercial Molasses*, 314 U.S. 108–10, 62 S.Ct. 156, 86 L.Ed. 89; *Schnell v. The Vallescura*, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373 (1934); *The Folmina*, 212 U.S. 354 (1909); *Artlemis Maritime Co. v. Southwestern Sugar & M. Co.*, 189 F.2d 488, 491 (4th Cir.1951); *International Produce, Inc. v. Frances Salman, etc.*, 1975 AMC 1521, 1534 (Cv. 5473, S.D.N.Y., May 23, 1975); *cf.: Edmond Weil, Inc. v. American West African Line*, 147 F.2d 363, 366 (2nd Cir.1945) (court adopted the alternative less favorable to the ship in view of its burden as common carrier) *The Vizcaya*, 63 F.Supp. 898, 904 (ED Penn 1945) ("if there is any doubt as to the unseaworthiness of the vessel, that doubt must be resolved against the shipowner.") As stated by Chief Justice Stone in *Commercial Molasses*:

> [T]he shipowner, in order to bring himself within a permitted exception ... imposed by statute or because he is a common carrier ... must show that the loss was due to an excepted cause and not to breach of his duty to furnish a seaworthy vessel.... And in that case, since the burden is on the shipowner, he does not sustain it and the shipper must prevail if, upon the whole evidence, it remains doubtful whether the loss is within the exception.

*Id.* 314 U.S. at 109, 62 S.Ct. at 160. If the evidence is left in equipoise and it is equally probable that the damage was caused either by an excepted cause or by the carrier's fault, then the burden has not been satisfied. *The Vallescura*, 293 U.S. at 306,

55 S.Ct. at 197. It appears then that these types of maritime claims are an exception to the general rule that the burden of persuasion never shifts from the party making the affirmative pleading. *See: Commercial Molasses*, 314 U.S. at 110, 62 S.Ct. at 160; *Florencio Román*, 454 F.Supp. at 525; Wigmore, *infra*, at Sec. 2486; C. Wright & K. Graham, *supra*, at Sec. 5122. The carriers argue that they have met this strict burden and, in the alternative, urge that they have proven that the cause of the damage falls within at least two other COGSA exemptions: fire and inherent vice in the goods, 46 U.S.C. Sec. 1304(2)(b), (m). They also contend that since part of this litigation is a limitation and/or exoneration proceeding it is upon plaintiff-claimants that the burden rests to prove the shipowner's liability.

As we indicated previously, in resorting to the COGSA exemptions, and depending on whether the exemption is one of cause or effect, sometimes the carrier's initial burden is satisfied by proving only an "effect" exemption without having to establish its absence of negligence. *See: PPG Industries v. Ashland Oil Co.-Thomas Petroleum*, 592 F.2d 138, 141–44 and dissenting op. 147–53 (3rd Cir.1978). *Lekas & Drivas*, 306 F.2d at 432 and Note, *supra*. In the case of exemption 1304(2)(b), "[f]ire, unless caused by the actual fault or privity of the carrier," the Second Circuit, characterizing this as an effect exemption, has indicated that once the carrier shows that the damage was caused by fire, the burden shifts to the shipper to show that the carrier's negligence caused or contributed to the fire or prevented its extinguishment. *Complaint of Ta Chi Nav. (Panama) Corp., S.A.*, 677 F.2d 225, 229 (2nd Cir. 1982). However, as often happens in these matters, East does not meet West. The Ninth Circuit has ruled that the carrier has the burden of proving the exercise of due diligence to make the vessel seaworthy as indicated in 1304(1) *before* availing itself of the fire exemption of 1304(2)(b) which it also has the burden of proving. *Sunkist Growers, Inc. v. Adelaide Shipping Lines,*

603 F.2d 1327, 1336–41 (9th Cir.1979). This dispute is of no concern to us for the carriers also took upon themselves the task of demonstrating that the fire-explosion, as presented by their theory of causation, occurred without any fault of their own.

 Nevertheless, the cargo interests also challenge the carrier's invocation of the fire exemption of COGSA and the Limitations Act by arguing that, even assuming that the carriers' theory were true, there was no fire involved in the loss of the EVA MARIA, only internal heating without combustion that activated a massive explosion which shattered the hull and permitted seawater to enter and gradually drag the vessel to ocean depths. They point to the definition of fire stated in *Western Woolen Mill Co. v. Northern Assur. Co.*, 139 F. 637 (8th Cir.1905):

> Fire is always caused by combustion, but combustion does not always cause fire. The word 'spontaneous' refers to the origin of the combustion. It means the internal development of heat without the action of an external agent. Combustion, or spontaneous combustion, may become so rapid as to produce fire; but, until it does so, combustion cannot be said to be fire. 'Fire' is defined in the Century Dictionary as 'the visible heat or light evolved by the action of a high temperature on certain bodies, which are in consequence styled "inflammable or combustible."' In Webster's Dictionary 'fire' is defined as 'the evolution of light and heat in the combustion of bodies.' No definition of fire can be found that does not include the idea of visible heat or light, and this is also the popular meaning given to the word.

*Id.* at 639, *cert. denied* 199 U.S. 608, 26 S.Ct. 750, 50 L.Ed. 331, also cited with approval in *The Buckeye State*, 39 F.Supp. 344, 347 (W.D.N.Y.1941) and *Cargo Carriers v. Brown S.S. Co.*, 95 F.Supp. 288, 292 (W.D.N.Y.1950). Subsequent cases have cast some doubt on the utility of relying on this technical differentiation. In *American Tobacco Co. v. The Katingo Hadjipatera*, 81 F.Supp. 438 (S.D.N.Y.1948) *modi-fied* 194 F.2d 449 the court held that if the internal heating eventually led to fire or combustion all of the damage caused by the prior heating as well as by the fire falls within the fire exemption. *See also: American Tobacco Company v. Goulandris*, 173 F.Supp. 140, 178 (S.D.N.Y.1959). Perhaps it is possible to argue convincingly that the effective cause of the loss was an explosion and not fire. In *The G.R. Booth*, 171 U.S. 450, 19 S.Ct. 9, 43 L.Ed. 234 (1898), for example, the court determined that the effective cause of cargo damaged by seawater was an explosion of a cargo of detonators that burst open a side of the vessel below the waterline and not the entrance of the water which would have been considered an exempting factor. *Id.* at 460. The cargo interests, however, take one more step in this argument and suggest that an explosion is not intended to fall within the fire exemption of COGSA or the older Fire Statute. Although we have not found, nor have the parties presented, cases bearing particularly on this point— most of the cases merely addressing the terms explosion and fire indistinctly, *see i.e.: Republic of France v. United States*, 290 F.2d 395 (5th Cir.1961); *Kokusai Kisen Kabushiki Kaisha v. Texas Gulf Sulphur Co.*, 33 F.2d 232 (5th Cir.1929) *cert. denied*, 280 U.S. 603, 50 S.Ct. 85, 74 L.Ed. 648 —this unexplored argument could have some validity in another context where the explosion and attending circumstances might have been of a different nature. *Cf. Federazione Italiana Dei Cors. A. v. Mandask Compania de V.*, 388 F.2d 434, 436–38 (2nd Cir.1968) (explosion-like shattering of ship's hull unaccompanied by any fire was considered not to have been caused by fire or heat). But the present circumstances where the explosion as portrayed by the carrier's established theory occurred because of heat, and, according to the testimony of the crew members and the photographs taken by them was almost simultaneously accompanied by an immense wall of fire, lead us to conclude that this particular explosion falls within COGSA's fire exemption and the Fire Statute. A different interpretation, given these facts, would

be similar to "clutching at straws to find liability." *Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha, (The Venice Maru)*, 133 F.2d 781, 785 (2nd Cir. 1943) *aff'd.*, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30. Defendant-petitioners have under the fire exemption, adequately established by the evidence in support of their theory that fire destroyed the goods and that the fire was caused without their actual fault or privity. In any event, as we shall later discuss, the shipowner has met the even stricter burden imposed by COGSA's all encompassing exemption, 46 U.S.C. Sec. 1304(2)(q).

Another conflicting and somewhat undeveloped matter is the criteria of burden of proof that the shipowner and lessee defendant-petitioners wish that the court adopt in relation to the Fire Statute defense of the Limitations Act and the traditional criteria of burden of proof established by COGSA. Many cases have held, as defendant-petitioners contend, that in a limitation of liability and/or exoneration proceeding under the Limitation of Liability Act the shipowner or a ship's lessee who "man(s), victual(s) and navigate(s) such vessel at his own expense, or by his own procurement," 46 U.S.C. Sec. 186, has the burden of proving its lack of privity or knowledge of the damaging cause while the burden of proving the shipowner's fault lies on the claimants. *Northern Fishing & Trading Company, Inc. v. Grabowski*, 477 F.2d 1267, 1271–72 (9th Cir.1973) and cases there cited; *see gen.:* Gilmore & Black, *supra,* at Sec. 10–25 and Benedict, *supra* at Vol. 3, Secs. 41, and 89–91. In terms of the Fire Statute, 46 U.S.C. Sec. 182, or the Limitations of Liability Act equivalent to COGSA's 1304(2)(b) fire exemption, this different standard would require that, if, after the case is submitted the cause of the fire remains in speculation, the claimants would not have carried their burden successfully and the shipowner should be exonerated. *Complaint of Caldas*, 350 F.Supp. 566, 573 (E.D.Pa.1972) *aff'd.* 485 F.2d 678; *Connell Bros. Co. v. Sevenseas Trading & Steamship Co.*, 111 F.Supp. 227, 230 (N.D. Cal.1953). It appears then, that although the Fire Statute and COGSA's fire exemption have been treated as equal in many aspects, *see: Complaint of Ta Chi*, 677 F.2d at 228–29, there is a significant difference in the imposition of the burden of persuasion on the claimants in the Limitation of Liability and the shifting of this burden to the carrier in COGSA. The particular situation created when a cargo claim under COGSA is consolidated, as in the instant proceedings, with a limitation and/or exoneration petition and its ensuing result of two different intertwined burdens has not been directly addressed in any of the cases brought to our attention. Even though the Limitation of Liability Act has been liberally interpreted in favor of the shipowner, *Consumers Import Co. v. K. Kaisha K. Zosenjo*, 320 U.S. 249, 254–56, 64 S.Ct. 15, 17–18, 88 L.Ed. 30 (1943), when the shipowner is also a common carrier the argument supporting the imposition of the burden on the carrier as the party having the better control over the evidence should apply with equal force. In the *Commercial Molasses* case the Supreme Court, in examining the burden applicable to a limitation of liability proceeding, distinguished the situation where the shipowner was a common carrier (or where the vessel is engaged in the carriage of two or more independent shipments of cargo, Benedict, *supra* at Vo. 2A Sec. 21–23, as is the case in the present litigation) from the situation where the carriage is a lease or of a private nature, *id.* The Court indicated that if the shipowner were a common carrier, the general doctrine of the prima facie burden shifting to the carrier would apply in view of the special nature of this relationship and the elements of public policy involved in it. 314 U.S. at 109, 62 S.Ct. at 160. The problem in the instant proceedings is further complicated by the crossover of roles as common carriers and shipowners of defendants corporate shipowner, charterer and navigator companies. Defendant-petitioner TMMex, in seeking the protection of the Limitations Act, has admitted that defendant-petitioner shipowner Pisces Ltd. is practically a dummy corporation designed

118

to enable TMMex to obtain financing and a non-Mexican crew, otherwise impossible under Mexican law. Nevertheless, as we shall later discuss, the disentanglement of the roles of these entities as common carriers is not required.

■ We agree with the Court's differentiation in *Commercial Molasses*, regarding the burden of proof and common versus private carriage, and consider that cargo claims against shipowners or bareboat charterers that hire themselves out as common carriers should proceed with the usual criteria of burden of proof established by COGSA or risk the possibility that Petitions for Exonerations could be misused to circumvent the statutory design and protection regarding burdens of proof afforded to shippers by COGSA *cf: Hanover Insurance Co. v. Shulman Transport Enterprises, Inc.*, 581 F.2d 268, 270 (1st Cir.1978) (found stipulation limiting liability to $50.00 per shipment contrary to public policy and COGSA). However, a review of all the evidence presented makes it unnecessary to rule on these novel matters of law. Likewise, there is no need to determine if the carriers could raise against the plaintiff-claimants, none of which were shippers, owners or representatives of the cargo of detonators and road graders in tween-deck stow number two, other COGSA exemptions such as inherent vice and shift the burden back to these shippers. This is not necessary because the carrier, shipowner, charterer and navigating crew defendants, perhaps due to the fact that they were all represented by the same counsel, have presented their case with such persuasive force so as to meet the stricter burden imposed by COGSA's catch-all exemption:

> (q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

46 U.S.C. Sec. 1304 2(q). Assuming that the high standard required of the common carriers by this exemption is the one applicable to the facts of this case, the evidence submitted by defendant-petitioners, when compared to that presented by cargo plaintiffs, leads us to conclude that this burden was convincingly met by defendant-petitioners. There is no need to determine if the other less imposing burdens of the Limitations Act, the fire exemption or other "effect" exemptions, apply to the facts of this case. At this stage, the court is no longer concerned with whose turn it was to offer proof. The importance of our discussion of the burden of proof lies in determining which party had the more demanding burden of offering not only sufficient proof, quantum wise, but also adequate proof in terms of convincing power.

After carefully weighing and comparing all the evidence presented by the parties, we are convinced that the defendant-petitioners carried their burden complying with the highest standards imposed by COGSA and the general admiralty law on this matter, assuming this standard were to apply. They have demonstrated by a preponderance of the evidence that they provided a seaworthy vessel and that they were free from fault regarding the cause of the damage. They also took it upon themselves to present a reasonable and probable explanation of why the detonators exploded. Their theory of causation rested on substantial and generally reliable scientific findings. The carriers' well-developed theory of spontaneous heating and their effective demonstration of due diligence in providing a seaworthy vessel created a very credible and robust position. They discharged their burden of production and persuasion. This had to be met with at least equal force by plaintiff-claimants. It was incumbent upon the cargo claimants to either produce evidence to discredit the carrier's theory of causation or to present proof of an alternative and more probable explanation for the loss that would involve the carriers' causative or contributory negligence. The failure to produce sufficient evidence to elaborate any one of these alternatives when the

exchange of burdens placed the duty to produce on the shippers' side was their fatal flaw.

The cargo interests did not significantly contradict or discard by scientific and objective data the experiments and the expert testimony presented by the carriers in support of their theory of spontaneous heating. The bare fact that Dr. Milton was on retainer for the P and I insurance group does not by itself discredit the reliability of his findings or his qualifications, which were never scientifically controverted nor seriously questioned. The experiments on spontaneous combustion carried out by the cargo interests which did not raise the temperature of the rice hulls significantly were performed without examining the contents of the material used, thus ignoring a central proposition in the carriers' theory. Defendant-petitioners' theory of internal heating, while resting like the cargo interests' theory on many inferences, had a stronger factual basis. There was a reasonable probability that the combustible ingredients which contaminated the cushioning rice hulls could have heated internally in view of the heat and humidity conditions encountered during the storage period and the voyage. It was equally probable to assume, given the conditions at the explosives plant and warehouse in Brazil, that the cushioning material contained other foreign matter and not merely rice hulls. It was never seriously disputed that the cushioning material used in the detonator boxes was essentially the same as the samples obtained by the shipowners' expert in Brazil to test for self-heating and spontaneous combustion. Although the experiments did not bring the internal heat of the material beyond 59°C, they did reveal that rice hulls with such foreign matter had the propensity for bacteriological and chemical self-heating. The fact that the actual transition from the bacteriological to the chemical self-heating process is very difficult to achieve in laboratory experiments does not rule out the reality of spontaneous combustion in material with said propensity, as demonstrated in the many past incidents of this sort in cases of cargo claims. *See: J.*

*Howard Smith, Inc. v. S.S. Maranon,* 501 F.2d 1275 (2nd Cir.1974); *The Oregon Mail,* 270 F.2d 499 (9th Cir.1959); *Old Colony Insurance Co. v. S.S. Southern Star,* 280 F.Supp. 189 (D.Ore.1967); *American Tobacco Company v. Goulandris,* 173 F.Supp. 140 (SDNY 1959) *aff'd. in part* 281 F.2d 179 (2nd Cir.1960); *Remington Rand, Inc. v. American Export Lines,* 132 F.Supp. 129 (SDNY 1955).

On the other hand, the evidence showed that the only possibilities for the detonators to have been activated by impact were either by a direct collision of sufficient force or by repeated strikes which would have separated the detonators from their boxes and exposed the explosive powder. At the heart of the cargo interests theory of impact due to improper stowage were many inferences resting on propositions that were never developed, at least to the point of having the semblance of probable facts. The first possibility required practically a frictionless movement of the graders hitting the detonators against a non-cushioning material with sufficient concentrated force; perhaps occurring if the graders had completely capsized and fallen free on top of the locker. The defendant-petitioners successfully demonstrated that the lashing of the graders, their position in the hold, their weight and configuration, the movements of the vessel during the wind and wave activity preceding the explosion and the relation of these elements to the concentration of force in cubic inches required to detonate the explosive by impact, did not support this possibility. And the showing of due diligence by the carriers in the stowage of cargo was never seriously questioned. Plaintiff-claimants' expert on stowage, whose particular experience in matters of stowage relevant to this case was very limited, only mentioned that Mr. Hill took too long to retighten the lashings on the grader in hold four when in fact Mr. Hill also examined the rest of the holds in those two hours. He also emphasized that the graders' weight rested on tires, ignoring Goncalvez' testimony that part of the weight rested on

wood. The cargo interests' expert on ship motion did not consider the dynamic force of the graders moving across the stow and impacting the detonators which, incidentally, are designed to detonate by *heat* and not by *force*. In fact, this expert's findings which were limited to the effect of the ship's motions to the lashings of the graders, were, even on this limited matter, repeatedly and effectively questioned during trial as being based on arbitrary and unreliable findings. The shippers' expert decision to adopt only one version of the several lashing arrangements was made without any satisfactory explanation. This seriously limited his findings to the point of affecting the ultimate conclusions, even assuming the rest of the calculations were correct. Even the rest of this expert's computations rested on dubious grounds. The incorporation of certain numbers into his calculations, such as safety and dynamic factors which also altered the results dramatically in favor of the shippers, was not adequately justified. Some of the factors considered for the discretionary adoption of said figures were never shown to have been related to their theory as being a direct component of the synergistic chain leading to the ultimate impact. For instance, the much underscored condition that the padeyes were welded on the McGregor hatch covers only indicated that said welding may have affected the effective sealing of the hatches on the hold when closed. Other "deficiencies" which led to the number five safety factor, such as the poor quality of the wire, were already incorporated in the formula, thus resulting in their being considered twice. In short, the reason why these specific numerical factors were adopted was never satisfactorily explained by the shippers' expert and remained merely as a speculative ingredient which served to significantly exagerate the final results of this study to the detriment of the carriers. The Court also noticed that throughout his deposition and trial testimony this expert had the disturbing habit of adopting figures and percentages, to which he would later be unable to ascribe any scientific support save for his arbitrary decision to do so. Likewise, this expert reached conclusions regarding matters he had admitted not to have considered and he failed to consult available data beforehand. These observations, as well as the other inconsistencies in this expert's research, compel us to seriously doubt the credibility of his findings.

The second proposition, the scenario of repeated impacts, was never supported by any expert testimony or scientific basis. The possibility of repeated impacts was superficially raised during cross-examination of defendant-petitioners' expert Ramsdell, who indicated that this was highly improbable due to the packaging of the detonators and to the required concentrated force. This alternative was never developed further by cargo. Aside from these remarks, it was never shown how, in the few hours after Officer Hill's last inspection, the road graders on hold number two which had their emergency brakes on, their transmission in gear and their tires blocked by wood, which moved and steered by a system of hydraulic pumps and which were lashed with a significant number of wires, could have moved, or rather, rolled freely during the ocean activity encountered and impacted the crate of detonators a sufficient number of times and with sufficient force to shatter the wooden locker, break the wooden crates inside the locker, keep on hitting the crates breaking them, the masonite board, the cartons and the small packages and, finally, scatter the individual cylinders somehow exposing their sensitive powder to the final impact. Although Mr. Clancey, plaintiff-claimants' explosives expert, indicated that the explosive powder inside the small cylinder was extremely sensitive when exposed, the multiple factors needed to get to this sensitive powder were never explained either by him, who was not an expert on stowage or on ship motions, or by the other expert whose credibility on his limited conclusions was seriously questioned. Without additional proof of this multiple impact theory, the Court finds it extremely difficult to consider it as something more than a remote possibility.

When compared with the proof offered by defendant-petitioners, the preponderance of the evidence demonstrates that the carriers' theory was much more convincing and probable than the cargo claimants' impact theory.

We do not pretend to ignore the wisdom of the principle commonly referred to as "Murphy's Law" on which the cargo interests have based their impact theory. But the scant scientific evidence in support of this theory, when compared with the carriers' strong showing of the improbability of many of the elements crucial to the cargo interests brewage of disaster, transported this theory far from the realm of the probable and into the gray zone of conjecture. The probability of the cargo interests theory of causation, absent some other objective data which they had the burden to produce, remained a distant hypothesis and not an unanswered doubt requiring that the court resolve it against the carrier.

 Although the general doctrine on cargo claims and COGSA have lightened the shipper's task in shifting much of the burden on the carrier, when the carrier's duty is discharged, the shipper has to rebut the carrier's case and curtail its thrust by providing satisfactory evidence of at least equally convincing power. The shipper can limit itself to challenging the carrier's theory of proximate cause based on an exempting clause or it can present another cause involving the carriers' negligence and solidify its position. In the present case, although the cargo interests decided to meet the carrier's case on both fronts by attacking the theory of spontaneous heating and by trying to present one of their own, their efforts were not supported by adequate and sufficient evidence. The end result of their failure to come forward with the necessary vigor was that, when all the evidence was duly weighed, they were left with a foundering case while the carrier's theory of causation surfaced and prevailed as the most persuasive and likely explanation for the EVA MARIA disaster. Granted there are some factors that will always remain uncertain since the vessel took these enigmas with it to the ocean depths. Yet, it would be unreasonable and would constitute an erroneous application of the standard of sufficiency of proof for civil cases, see: 9 Wigmore, *Evidence*, Sec. 339, p. 795 (2nd Ed.) to impose on the carrier the practically impossible task of retrieving from a rusting hull lying somewhere on the bottom of the Gulf of Mexico all the necessary data to yield an *exact* explanation for the explosion that sank the vessel. Under such circumstances, the spontaneous-heating theory was more than adequately established by the carrier. To require of carriers a 100% degree of certainty would be to impose on them a standard of proof higher than that required by a state in prosecuting its criminal offenders. *See:* McCormick, *supra*, at N. 60. Absolute certainty cannot always be required from the evidence for it is difficult to obtain it in the context of a judicial proceeding. As indicated by professor Morgan in his often cited article:

[A] lawsuit is merely a proceeding for the orderly settlement of a dispute and lacks many of the characteristics of an investigation for the ascertainment of truth. Even in the field of the exact sciences it is difficult, if not impossible, to get beyond a working hypothesis; and in judicial inquiries as to past events, concerning which there is a dispute, it is idle to hope to discover more than the preponderance of probabilities. That preponderance may be so very heavy as to produce in the mind of the trier a conviction strong enough to make him willing to act upon it as indubitable. It may be heavy enough to create an opinion upon which the trier feels himself abundantly justified in acting although he is willing to concede that he entertains a reasonable doubt against it. Or it may have only such weight as to convince him that although his deduction is open to considerable doubt, on the whole it is more probably true than not. Of course, it is not necessary to explain to the jury the impossibility of acquiring absolutely accurate knowledge concerning any fact of history. Judges and juries have for

centuries gone upon the assumption that they find the facts as bases for declarations of the legal relations arising therefrom. And for all practical purposes men do and must act upon what appears to them to be the preponderance of probability.

E. Morgan, *Instructing The Jury Upon Presumptions and Burdens of Proof*, 47 Har.L.Rev. 59, 62 (1933). Likewise, to impose liability on the carriers merely because of isolated and minor instances of lack of diligence (i.e.: lack of surveyor present at loading; wire over sharp edges; part of the graders' weight resting on rubber tires) that were never developed into a coherent causative relationship would be to adopt the old standard of absolute liability on carriers for any unseaworthy instance which, as previously discussed, was rejected by COGSA and subsequent cases. When the evidence offered by the parties is compared, the preponderance of the evidence, or the preponderance of probabilities as this standard is sometimes called, *see: id.*, at 66, demonstrates that the carrier's theory of causation was the most reasonable and convincing explanation for the loss.

■ We hold that the explosion that eventually sank the M/V EVA MARIA was caused by the spontaneous heating of the cushioning material used in the packaging of the detonators. None of the defendant-petitioners were responsible for nor cognizant in any manner pertinent to this litigation with the use of such cushioning material in the packaging of the detonators. We further hold that the defendant-petitioners did not contribute in any manner by negligent acts or omissions to the explosion which sank the vessel. In view of the absence of liability of the insured defendant-petitioners, their insurance companies are not responsible to the cargo interests for the losses. Our conclusions today make it unnecessary to rule on the other incidental matters raised by the cargo interests, i.e.: whether the defenses of the Limitation of Liability Act are available to the defendant-lessee and operators or their insurance companies; whether the direct action against the insurance company provided by the Puerto Rico Insurance Code is available to plaintiff-claimants in a suit in admiralty.

■ The counterclaim filed by TMMex to recover unpaid freight lacks merit for, there being no contractual provision to the contrary, ocean freight charges are not earned unless and until the goods are delivered to destination. *See: Alcoa S.S. Co. v. United States*, 338 U.S. 421, 423, 70 S.Ct. 190, 191, 94 L.Ed. 225 (1949). There was no such contractual provision in this case and the cargo never arrived at its destination.

Accordingly, the claims by cargo interests plaintiffs and intervenors in 78–0152 as well as the counterclaim filed by defendant TMMex are hereby DISMISSED. Since the court has found that there was no fault on the part of the carrier or of the shipowner related to the cause of the vessel and cargo loss, the Petition for Exoneration is GRANTED and all claims in 78–1408 are DISMISSED. Judgment shall be entered accordingly.

SO ORDERED.